**Gregory DEPAPE, Plaintiff,**

v.

**TRINITY HEALTH SYSTEMS, INC., Trimark Physicians Group, Inc., and Blumenfeld Kaplan & Sandweiss, P.C., Defendants,**

and

**Trinity Health Systems, Inc. and Trimark Physicians Group, Inc., Third–Party Plaintiffs,**

v.

**Blumenfeld Kaplan & Sandweiss, Third–Party Defendant.**

No. C01–3043–MWB.

United States District Court, N.D. Iowa, Central Division.

Jan. 20, 2003.

Lawrence L. Marcucci, Marcucci & Conger, PLC, West Des Moines, IA, for Plaintiff.

Stuart J. Cochrane, Johnson, Erb, Bice, Kramer, Good & Mulholland, PC, Fort Dodge, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING BENCH TRIAL ON THE MERITS

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 589

II. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 590

III. CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 601
 A. Count I: Promissory Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 602
 B. Count II: Breach–of–Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 603
 C. Count III: Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 605
 D. Count IV: Legal Malpractice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 608
 1. Failure to pursue H–1B visa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 608
 2. Failure to communicate and advise . . . . . . . . . . . . . . . . . . . . . . . . . . . . 609
 a. Breach of duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 609

b. *Causation* ................................................... 612
c. *Damages* .................................................... 614
 i. *Lost income* ............................................. 614
 ii. *Emotional distress* ...................................... 615

*IV. CONCLUSION* .................................................... 617

*We recognize the importance of personal contact with clients as an integral part of being a responsive firm.* -Blumenfeld, Kaplan & Sandweiss, P.C. law firm web-site, found at *www.bks-law.com.*

The plaintiff in this breach-of-contract and legal malpractice case, Dr. Gregory dePape, is a Canadian citizen who completed his medical studies and training in Canada. Thousands of miles away in the small city of Fort Dodge, Iowa, Trimark Physicians Group, Ltd. ("Trimark") sought a family physician to fill a vacancy and to meet the burgeoning needs of the Fort Dodge medical community. Through a consulting firm, Trimark successfully recruited Dr. dePape to fill this vacancy, and in March of 1999, Trimark and Dr. dePape, while still living and working in Canada, entered into a five-year employment contract.

As part of the contract negotiations process, the parties discussed immigration matters and the fact that Dr. dePape needed to obtain a visa for lawful entry and permission to work in the United States prior to beginning employment. In order to obtain such permission, Trimark engaged the services of a St. Louis, Missouri law firm, Blumenfeld, Kaplan & Sandweiss, P.C.

The facts of this case will be discussed in far more detail below in the court's Findings of Fact. By way of introduction, it suffices to say that, on June 8th, 2000, Dr. dePape, at the direction of the Blumenfeld

law firm, having flown 3,000 miles from the home he was leaving in Vancouver, British Columbia, attempted to cross the Peace Bridge at the Canadian/Buffalo, New York border into the United States on his convoluted immigration journey to begin practicing family medicine in Fort Dodge, Iowa. Dr. dePape found himself stranded at the Canadian/United States border in shock—homeless, jobless, and temporarily possessionless. This litigation raises the question of who, if anyone, bears legal responsibility for Dr. dePape's plight.

## I. INTRODUCTION

Dr. dePape initiated this lawsuit on April 18, 2001.[1] In his original complaint, he named Trimark and Trinity Health Systems, Inc. ("Trinity") as defendants.[2] He alleged causes of action based on promissory estoppel (count I), breach of contract (count II—against Trimark only), and negligence (count III). Defendants Trinity and Trimark answered on June 6, 2001, and on October 29, 2001, they brought a third-party action against the Blumenfeld law firm. In their third party complaint, Trimark and Trinity alleged legal malpractice against the Blumenfeld law firm and, assuming liability, sought contribution and indemnification. On the eve of trial, Dr. dePape amended his complaint and likewise asserted a legal malpractice claim against Blumenfeld.

A non-jury bench trial was held in this matter on November 4–7, 2002 in Des

---

**1.** Jurisdiction is proper under 28 U.S.C. § 1332 (diversity). Dr. dePape is a Canadian citizen, both Trinity and Trimark are Iowa corporations with their principal places of business in Iowa, and Blumenfeld, Kaplan &

Sandweiss, P.C. is incorporated in and has its principle place of business in Missouri.

**2.** Trimark is a wholly owned subsidiary of Trinity.

Moines, Iowa.[3] At this bench trial, the plaintiff was represented by Lawrence L. Marcucci of Marcucci & Conger, P.L.C., West Des Moines, Iowa. Defendants Trimark and Trinity were represented by Stuart J. Cochrane of Johnson, Erb, Bice, Kramer, Good & Mulholland, P.C. of Fort Dodge, Iowa. And finally, defendant Blumenfeld was represented by Rosco A. Ries, Jr. of Whitfield & Eddy, P.L.C., Des Moines, Iowa. All parties submitted post-trial briefs, which the court has duly considered. The court finds that the matter has been fully submitted and that it is now before the court for final disposition.

## II. FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52, a court presiding over a bench trial is required to make findings of fact and conclusions of law. In reviewing a district court's order entering judgment after a bench trial, the court of appeals reviews the district court's factual findings for clear error and reviews its legal conclusions de novo. FED. R. CIV. P. 52(a); *Speer v. City of Wynne, Ark.*, 276 F.3d 980, 984–85 (8th Cir.2002). "Under this standard, [the Eighth Circuit Court of Appeals] overturn[s] a factual finding only if it is not supported by substantial evidence in the record, if the finding is based on an erroneous view of the law, or if [the appellate court is] left with the definite and firm conviction that an error has been made." *Estate of Davis v. Delo*, 115 F.3d 1388, 1393–94 (8th Cir.1997). In addition, a reviewing court gives due regard to the opportunity of the district court to judge the credibility of the witnesses. *Id.;* FED. R. CIV. P. 52(a).

The facts in this case are not seriously in dispute—only in some instances do the parties' versions of the facts vary. In any event, the court, as the factfinder in this bench trial, did not have difficulty discerning what actually happened.

Dr. dePape is from British Columbia, Canada. He received his medical degree from the University of British Columbia in May of 1997 and completed his specialty training in family medicine at Dalhousie University in Halifax, Nova Scotia in June of 1999. He focused his medical training on rural medicine, and he hoped to practice in a small United States community as a family physician. Medical students typically begin the job search process at least one year before completing their residency training. Dr. dePape had a job offer from a clinic in Grand Forks, North Dakota, but the prospect of a long and cold North Dakota winter was daunting. Thus, he kept his options open, and he was pleased to be contacted by Dawn Hamman of Enterprise Medical Services. Ms. Hamman was a Physician Search Consultant, and Trimark had engaged her firm's services to recruit a family physician who was a good "fit" and who was willing to relocate to Fort Dodge to fill a family physician vacancy.

Through Ms. Hamman, Dr. dePape and Trimark entered into discussions in January of 1999. Trimark offered Dr. dePape a position, and contract negotiations proceeded swiftly. By March of 1999, Trimark and Dr. dePape were ready to put their agreement into writing. On March 9, 1999, Trimark and Dr. dePape entered into a five-year Professional Employment Agreement. Pursuant to this agreement, Dr. dePape would receive an annual income of $130,000 the first year, $140,000 the second year, and a percentage of his net production the following years. In addition, Trimark constructed a new office

---

**3.** This is a Northern District of Iowa case, but by agreement of all the parties, the bench trial was held in a United States District Court for the Southern District of Iowa courtroom in Des Moines, Iowa.

for Dr. dePape, guaranteed him an interest-free loan (up to $100,000) to pay his school debts, contributed to a 401K plan on Dr. dePape's behalf, provided life insurance benefits, and agreed to pay for Dr. dePape's professional dues and licensure expenses. Not included within the terms of the Professional Employment Agreement but pertinent to this lawsuit are discussions and oral agreements relating to Dr. dePape's immigration to the United States.

During the course of the negotiations process, Jack Grandgeorge was the primary liaison between Trimark and Dr. de-Pape. At Trimark, Mr. Grandgeorge was a vice president and a full-time recruiter. Dr. dePape and Mr. Grandgeorge discussed immigration matters, and, in a March 11, 1999 memorandum, Mr. Grandgeorge confirmed in writing the "verbal promises made" to Dr. dePape. [Pf. exh. 4]. The memo indicates that, among other promises, Trimark agreed to "pay for the immigration costs" associated with Dr. dePape's immigration. [Pf. exh. 4]. In this regard, Richard Rhiner, the Senior Vice President of Trinity Health Systems, reiterated this promise in a letter to Dr. dePape, dated March 17, 1999. [Pf. exh. 8]. Mr. Rhiner's letter advises that Trinity Health Systems had engaged the services of the Blumenfeld law firm and that the costs incurred would be assumed by Trinity Health Systems.

Trinity retained the Blumenfeld law firm in April of 1999 on the advice of Ms. Hamman. Ms. Hamman recommended the Blumenfeld firm based on her prior experience with one of the firm's partners, Partner A.[4] The Blumenfeld law firm was experienced in assisting Canadian physicians to immigrate to the United States. In fact, it had been successful in the past in gaining entry to the United States on behalf of at least six other Canadian physicians using the identical strategy it ultimately employed in Dr. dePape's case. In addition, Partner A was the chief editor of a book that deals entirely with the immigration of foreign physicians to the United States—*AILA's Occupational Guidebook: Immigration Options for Doctors* (1995). Both Partner A and Partner B were contributing authors to this book.

It was clear to all parties that the ultimate goal in engaging the Blumenfeld firm was to obtain a "green card" for Dr. de-Pape so that he could remain permanently in the United States. Trimark made this goal exceedingly clear to Blumenfeld. Dr. dePape's employment contract was for five years, but both he and Trimark envisioned a long-term employment relationship. Trimark, perhaps even more so than Dr. de-Pape, was eager to begin the employment relationship. It constructed a new office for Dr. dePape and expended a considerable amount of money in recruiting him and paying for his visits to Fort Dodge. It viewed Dr. dePape as a "perfect fit" with its physician's group and highly anticipated his arrival.

Dr. dePape was likewise excited about beginning his career in Fort Dodge. He chose to come to the United States because he viewed the health system in this country as more patient-friendly than the Canadian system, which he testified is marked by delays in treatment. In Fort Dodge, he saw the opportunity to practice family medicine in a rural area with a group of like-minded physicians, and Dr. dePape expected to have a long, if not permanent, successful and fulfilling career with Trimark.

---

**4.** Two partners at the Blumenfeld firm worked on Dr. dePape's case. The court, however, feels that it is unnecessary to reveal their identities. Instead, the individual lawyers will be referred to as Partner A and Partner B.

On April 23, 1999, one month after Trimark and Dr. dePape entered into their employment contract, Blumenfeld held an initial conference regarding its representation of Trimark and Dr. dePape. Partners A and B of the Blumenfeld firm, Mr. Rhiner, Mr. Grandgeorge, and Ms. Hutto participated in this initial conference. Notably, Blumenfeld did not advise Dr. dePape to participate, nor did it even inform him of the conference. At this conference, Blumenfeld outlined Dr. dePape's immigration options. At the time of this conference, Blumenfeld learned (1) that Dr. dePape had a five-year employment contract with Trimark; (2) that both Dr. dePape and Trimark expected an employment relationship that would endure longer than five years and, ideally, the entirety of Dr. dePape's medical career; and (3) that Dr. dePape had not taken a three-stage set of examinations, known as the USMLE's,[5] which precluded him from receiving one of the two visas available to foreign physicians—namely, the H–1B visa.

At this initial conference, Blumenfeld advised Trimark that Dr. dePape could enter the United States on one of two visas: either an H–1B visa or a TN visa. This is so despite Blumenfeld's early knowledge that Dr. dePape was not eligible for an H–1B visa and despite its failure to even suggest that Dr. dePape should consider taking the USMLE's in order to become H–1B–eligible. Blumenfeld's clear focus in the initial conference and continuing throughout its representation of the plaintiff and Trimark was primarily on the H–1B visa labor certification process. Moreover, while no one who participated in the initial conference was able to recall precisely what was discussed, Blumenfeld's notes relate almost entirely to the H–1B labor certification process. [Trimark exhs. 102, 148]. The only reference to the TN visa in Blumenfeld's notes falls at their conclusion and states only Blumenfeld's fees for pursuing this visa.

After holding the initial conference, Partner A sent Mr. Rhiner an engagement letter on April 26, 1999, confirming the parties' agreement and Blumenfeld's commitment to represent Trimark **and** Dr. dePape throughout the immigration process. It bears repetition that it is undisputed in this litigation that Blumenfeld represented both Trimark **and** Dr. dePape. The engagement letter specifically states that both Trimark and Dr. dePape are Blumenfeld's clients, but Partner A sent a copy of the letter only to Trimark. Thus, Blumenfeld's pattern of failing to communicate with Dr. dePape arose from the very outset of its representation of him. The engagement letter outlines Dr. dePape's immigration options; yet Blumenfeld did not send a copy to him, nor did Blumenfeld advise Trimark to forward the engagement letter to Dr. dePape. Dr. dePape did not see the letter until preparing for this trial. In addition, the letter, like the conference, focuses on the H–1B visa and does not explain the stringent limitations of the TN visa. Indeed, the subject heading of the engagement letter is "Labor Certification Application Based Upon Request for Reduction in Recruitment for Dr. Gregory E. DePape [sic]." [Pf. exh. 9].

On April 30, 1999, Mr. Grandgeorge retired. Megan Hutto filled his position and

---

**5.** The Federation of State Medical Boards of the United States, Inc. (FSMB), and the National Board of Medical Examiners (NBME) cosponsor administration of the United States Medical Licensing Examination, or "USMLE." USMLE, <http://www.usmle.org/>. The USMLE is a three-part examination, with each part assessing different skills. "The three Steps of the USMLE assess a physician's ability to apply knowledge, concepts, and principles that are important in health and disease and that constitute the basis of safe and effective patient care." *Id.*

became the primary intermediary between Dr. dePape and Trimark. Ms. Hutto's job with Trimark was her first job out of college, and by all accounts, she was extremely competent, albeit inexperienced. Her principal duty, pertinent to this case, was to facilitate communication between Trimark and Dr. dePape and to make Dr. dePape's transition to Trimark as seamless as possible.

Ms. Hutto held a bachelor's degree in Microbiology and a master's degree in Healthcare Administration. Neither she nor anyone else at Trimark had any training in immigration law. Yet, like Ms. Hutto's employer, Blumenfeld relied heavily—most times solely—on Ms. Hutto as a conduit for its communication with Dr. dePape.

It is undisputed that an H–1B visa is the preferred method of bringing a foreign physician into the United States. It is available to individuals engaged in certain enumerated specialty occupations, ranging from fashion modeling to practicing medicine. Like a TN visa, an H–1B visa is a temporary, non-immigrant visa. Temporary visas are just that—temporary. A common thread of all temporary visas is that the visa-holder must not have the intent to remain permanently in the United States. The INS, however, recognizes the concept of "dual intent" with H–1B visas. This means that, while an H–1B visa is only temporary, a pending application for permanent residency does not disqualify someone from receiving H–1B status. This is so despite the fact that, technically, an H–1B visa applicant or holder must not have the intent to remain permanently in the country.

In order to perform direct patient care on an H–1B visa, the foreign physician must have successfully completed the USMLE's. In addition, the employer seeking to employ an H–1B visa-holder must petition the United States Secretary of Labor for labor certification. This process appears to be, for the most part, a game of smoke and mirrors, in which the employer, having already decided to employ a specific foreign national, places advertisements in various national newspapers in order to show that it made a good faith effort to employ a qualified United States citizen but was unable to find one. This showing is a prerequisite to receiving labor certification, and Blumenfeld wrote and published at least one job vacancy announcement on Trimark's behalf. Blumenfeld's ad intentionally emphasized the negative aspects of the job to discourage U.S. citizens from applying.

Placement of such an ad was one aspect of the services associated with the labor certification process that Blumenfeld performed and for which it charged substantial fees This is particularly troubling in light of Blumenfeld's knowledge that Dr. dePape was not eligible for an H–1B visa. Furthermore, Blumenfeld never attempted to ascertain whether Dr. dePape would complete the USMLE's, nor did it advise Dr. dePape that completion of the USMLE's was a necessary prerequisite to obtaining an H–1B visa and would be in his best interest. No one suggested to Dr. dePape that he should consider taking the USMLE's in order to become H–1B–eligible until *after* his failed entry attempt on June 8, 2000. Dr. dePape declined that option because he held misconceptions about the length of time that it took to complete the exams. Dr. dePape believed that the USMLE's could not be completed in fewer than two years, while Partner A and Partner B testified that the process could be completed in six to eight months. Had Blumenfeld conveyed this information to Dr. dePape, he might not have been opposed to taking them, especially if he had been advised about the USMLE process in April of 1999 because the evidence suggests that Dr. dePape could have com-

pleted the examinations before he was eligible to enter the United States under either the H–1B visa or the TN visa, as both visas required that he obtain an Iowa medical license prior to seeking entry to the United States, and Dr. dePape did not receive his Iowa license until May 31, 2000.

When Blumenfeld belatedly ascertained that Dr. dePape could not enter the country on an H–1B visa, it switched gears and began working on a TN visa. And while the TN visa option was briefly discussed at the initial conference between Trimark and Blumenfeld and reiterated in the April 26, 1999 engagement letter, Blumenfeld did not begin work on a TN visa until December of 1999. More importantly, until the fateful fiasco at the Peace Bridge on June 8, 2000, Blumenfeld never discussed the stringent requirements of a TN visa with Dr. dePape.

The North American Free Trade Agreement ("NAFTA") provides for "trade national" visas for certain professionals. Only Canadian and Mexican citizens may enter the United States on TN visas. The pertinent provision of the TN law allows for the temporary entry of Canadian citizens who are physicians entering the United States in order to perform teaching and research duties, which may include "incidental patient care." Unlike the H–1B visa, INS interpretations of the TN visa do not recognize "dual intent" so that a pending labor certification petition or application for permanent residency disqualifies an individual from entering the United States on a TN visa. This is so because the TN visa requires a bona fide intent to remain only temporarily in the United States and to not have the intent to establish permanent residency in the United States. The regulations promulgated in

association with the TN visa define "temporary entry" and provide:

Temporary entry, as defined in the NAFTA, means entry without the intent to establish permanent residence. The alien must satisfy the inspecting immigration officer that the proposed stay is temporary. A temporary period has a reasonable, finite end that does not equate to permanent residence. In order to establish that the alien's entry will be temporary, the alien must demonstrate to the satisfaction of the inspecting immigration officer that his or her work assignment in the United States will end at a predictable time and that he or she will depart upon completion of the assignment.

8 CFR § 214.6(b).

Similarly, the NAFTA handbook[6] explains the requisite "intent" element of a TN visa:

Temporary Entry—8 CFR 214.6(b)

AILA [American Immigration Lawyers' Association] suggested that the [Immigration and Naturalization] Service apply the concept of "dual intent" to the TN classification to accommodate business persons who may be adversely affected by the filing of a permanent residence petition or an application for a labor certification in their behalf. The concept of "dual intent" allows certain nonimmigrant aliens to retain nonimmigrant status even where the alien may have made application for permanent residence or where an employer has filed an application for a labor certification or employment-based petition in his or her behalf.

This suggestion cannot be adopted because it is clearly inconsistent with Article 1608 of the NAFTA. For purpose of

---

**6.** The NAFTA Handbook is provided by INS Headquarters Inspections as reference material to assist immigration inspectors in processing applicants for admission as non-immigrants under the NAFTA.

Chapter 16 of the NAFTA, Article 1608 of the NAFTA defines "temporary entry" specifically as "entry into the territory of a Party by a business person of another Party *without the intent to establish permanent residence.*" (Emphasis added) In order to further explain the temporary nature of a TN alien's entry into the United States, the definition of "temporary entry" has been clarified in the final rule providing that while there is no specific limit on the total period of time a citizen of Canada or Mexico may remain in TN status, the TN classification is nevertheless for persons seeking temporary entry without the intent to establish permanent residence. This clarified definition of "temporary entry" comports with that used by the Department of State and the intent of the Article 1608 of the NAFTA. *See* 22 CFR 41.59(c) (December 28, 1993).

UNITED STATES DEPARTMENT OF JUSTICE IMMIGRATION & NATURALIZATION SERVICES, NAFTA HANDBOOK § 1, ch. 16, Annex 1608 (1999) (citing 63 Fed.Reg. 1331, 1333 (Jan. 9, 1998)), *found at* 1999 WL 33438091.

When Blumenfeld began work on a TN visa for Dr. dePape, it knew that the position described in his Employment Agreement would not pass muster as an acceptable TN classification job description for two reasons. First, the TN visa is temporary, and Dr. dePape had a five year employment contract that he intended to be extended indefinitely. Second, the TN visa is available to North Americans who are coming to the United States to perform certain enumerated professional jobs, and a family physician is not one of the permissible job classifications. Physicians entering the United States on TN status are permitted to conduct research and to teach, and patient care is limited to that which is incidental to the research or teaching. Because Dr. dePape had a contract that outlasted the duration of the TN

visa and was for a job that was not permitted by the visa, Blumenfeld, without consulting its clients, concocted a fictitious job title and description. Blumenfeld labeled this position "Physician Consultant" and described the duties of this position as a "community health care needs assessment." Blumenfeld did not discuss with Dr. dePape or Trimark the newly created position or the fact that Dr. dePape could not enter the United States and practice family medicine on the TN visa. Furthermore, at trial, Blumenfeld admitted that it merely "cut and pasted" the community health care needs assessment description that it had used with prior Canadian physicians into Dr. dePape's TN application letter.

According to Partner B, a community health care needs assessment is a study whereby a physician learns the demographics and the needs of a community in which he or she plans to develop a new practice by performing direct patient care. Partner A admitted at trial that he created the community health care needs assessment without consulting the hospital to determine if it was needed, if it would be beneficial, or if it would be done. Both Partner A and Partner B assumed that they "must have" explained the community health care needs assessment to Dr. dePape, but they were unable to produce any telephone, email, billing record, or other writing that would suggest they had done so. In fact, it would have been difficult for Blumenfeld to have explained to Dr. dePape the nuances of the community health care needs assessment and the complexities of the TN visa because Blumenfeld did not even have Dr. dePape's phone number or address on file and never once attempted to contact him. Dr. dePape initiated what little contact there was with Blumenfeld, and the entirety of their single conference took place in 1/10 of an hour. It would be impossible to explain the cerebral

subtleties of the TN visa and the severe limitations that would accompany Dr. dePape's entry to the United States on this visa in six short minutes, and Partners A and B did not attempt to argue that they had done so. Moreover, the court specifically finds that they did not.

Blumenfeld had successfully used the community health care needs assessment in the past with at least six other Canadian physician TN entries. In at least five of the six prior cases, neither the foreign doctor nor the employing hospital requested the community health care needs assessment, and the evidence strongly suggests that all but one of Blumenfeld's clients never actually performed such an assessment after gaining entry. Instead, the community health care needs assessment was merely a subterfuge by which to gain entry. Once accomplished, the foreign physicians proceeded to adjust their status to permanent residents. The community health care needs assessment was solely the creation of the immigration lawyers, and they were the only ones who knew what it was. In this case, it is clear that no one at Trimark or Dr. dePape had any indication of what a community health care needs assessment entailed or how it was to be implemented; therefore, there is no way Trimark could have legitimately carried through with it. The court finds that, had Dr. dePape gained entry, a community health care needs assessment would not have been performed and that Blumenfeld did not expect that it would be.

Furthermore, even if Dr. dePape would have followed through with Blumenfeld's interpretation of a legitimate community health care needs assessment, he still would not have been in compliance with the TN law because his job as a Physician Consultant, according to Partner B, would not have interfered with his family physician duties. Partner B testified that a physician could enter the United States on a TN visa and legitimately perform his or her duties as a family physician because this patient care would enable the physician to "get a feel" for the demographics of the area. As such, Dr. dePape would have had significant direct patient care, which the TN law does not permit. Blumenfeld argued at trial that the meaning of "incidental patient care" that a TN visa-holder may perform is a grey area of the law because it is undefined in the regulations. While perhaps true, this case does not require the court to decide a case of first impression regarding the meaning of "incidental patient care" because there is no question that the level of patient care that Blumenfeld argued Dr. dePape could lawfully provide in Fort Dodge is anything but incidental.

Webster's Collegiate Dictionary defines "incidental" as "being likely to ensue as a chance or minor consequence." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 587 (10th ed.1995). Similarly, Princeton University's WordNet defines it as "not of prime or central importance." Princeton University, *WordNet, found at* < *http://dictionary.reference.com/search?q = incidental* >. In this case, Dr. dePape and Trimark intended that, even if Dr. dePape would have performed a community health care needs assessment, the *primary* component of the community health care needs assessment would have been the provision of direct patient care. Because primary is antonymous with "incidental," the court concludes that Blumenfeld's version of a community health care needs assessment would not have been lawful. Instead, it was a sham artifice to impermissibly allow Canadian physicians entry into the United States.

The court, furthermore, finds that Blumenfeld's interpretation of the requisite "temporary entry" intent of a TN visa is similarly flawed. The regulations inter-

preting "temporary entry" clearly state that a TN applicant cannot possess the intent to establish residency in the United States. At trial, Partner A testified that the law permitted Dr. dePape to sign a five year employment contract with Trimark and to have the intent to immigrate to the United States and practice medicine here forever so long as, at the moment he crosses the border, he is not eligible for permanent resident status. In other words, Dr. dePape would have the requisite temporary intent until the moment INS issues him a green card because, regardless of his aspirations to become a permanent resident, he cannot realize those aspirations until INS grants him permanent resident status. Partner A described this abstract distinction as choate versus inchoate intent, and he acknowledged that there are no cases, law journals, regulations, or INS interpretive guidelines adopting this approach. The court finds that this definition is wholly unsupported by the law.

Because no one but Blumenfeld knew what a community health care needs assessment was, because the hospital did not request or need it, and because Blumenfeld's interpretation of inchoate intent is in direct contradiction of the plain language of the TN law, the court finds that the whole notion of a community health care needs assessment was a sham and a creative artifice to get Dr. dePape into the United States. Dr. dePape unquestionably had the intent to permanently immigrate to the United States, and the community health care needs assessment was solely the creation of Blumenfeld's own legal gymnastics, which had no basis in reality because Blumenfeld was the only party involved that had any an inkling of what it meant.

Furthermore, Blumenfeld's disturbing practice of exclusively using the INS office in Buffalo, New York for its Canadian TN entries bolsters the court's conclusion that the community health care needs assessment is a sham. While Partner A and Partner B testified that the INS officials at that office were more knowledgeable of the TN visa, the record reveals that Blumenfeld had one particular INS officer in mind when it chose that location. That officer was not working the day Dr. dePape attempted to enter the United States, but had he been on duty, Dr. dePape would be in Fort Dodge today. Moreover, Blumenfeld testified that it exclusively used Jim Eiss as its local counsel in Canadian entries. While in isolation this practice is not unusual nor unethical, the evidence establishes that Blumenfeld used Mr. Eiss because he was a former INS agent at the Peace Bridge. The fact Blumenfeld had Dr. dePape travel 3,000 miles to enter at a port of entry where Blumenfeld's local counsel had an inside connection and where Blumenfeld knew a specific INS officer would permit entry to perform a community health care needs assessment leads to the inescapable conclusion that Blumenfeld at least suspected, if not knew, that its community health care needs assessment strategy with Canadian physicians was suspect.

The TN visa does not have an application form like most visas. Instead, a TN visa involves a United States employer writing a letter of support, describing the position to be filled. At the border, the TN applicant presents the letter, along with proof of his or her citizenship and qualifications. Partner B drafted the employer's letter describing the community health care needs assessment, forwarded it to Ms. Hutto, and instructed her to transcribe it on Trimark letterhead and to have Dr. Whitters sign it. Incredulously, Partner B testified that she assumed the community health care needs assessment was acceptable to the clients because Dr. Whitters signed the TN application letter

without objecting to the job description. Dr. dePape did not see the letter, nor the accompanying job description, until the day of his failed entry attempt.

The letter of support, dated May 4, 2000, describes Dr. dePape's position with Trimark as follows:

*Professional Activity*

Dr. dePape is coming to the United States as a Physician Consultant for Trimark Physicians Group, Inc. to conduct a community health care needs assessment. The profession of Management Consultant appears on Schedule II to Annex 1603 of the North American Free Trade Agreement

*Purpose of Entry*

The [Trimark Physicians] Group needs to have a community health care needs assessment conducted by a Physician who can help it assess the health care needs of the residents of its service area (Fort Dodge, Iowa) and the ways in which those needs can best be met.

The Physician in this position will be responsible for conducting a community health care needs assessment for Fort Dodge, Iowa, and the surrounding area. These activities will include meeting with small groups of residents to discuss the community's health care needs, examining existing medical facilities and equipment to determine their adequacy for meeting the community's health care needs, researching and analyzing the community's medical and health care demographics, and conducting cost analyses. This appointee will be expected to provide advice and guidance to the Group with respect to the steps it should take to better meet the health care needs of the residents of its service area,

and he may engage in incidental patient care in connection with this research. [Pf. exh. 38].

As to the duration of Dr. dePape's purported employment as a Physician Consultant, the letter states that "Dr. dePape's initial engagement with Trimark Phsycians Group, Inc. will be for a duration of three months, but as noted above, we ask that Dr. Dieppe's TN status be approved for a period of one year, in case the project takes longer than anticipated to complete." [Pf. exh. 38]. The letter goes on to list "Dr. Dieppe's" qualifications and to state the monthly compensation to be paid. As is evident from the transposition of Dr. Dieppe's name where Dr. dePape' name should be,[7] Blumenfeld had used this letter and job description before, and Partners A and B admitted as much.

Meanwhile, while Blumenfeld was billing for an H–1B visa for which Dr. dePape was not qualified and preparing its sham TN application, Dr. dePape was completing his medical training in Canada. Due to a glitch in the Iowa State Board of Medical Examiners' rules, Dr. dePape did not receive his Iowa medical license until June 1, 2000, but he became a licensed physician in Canada in July of 1999. Because he could not begin work in Fort Dodge until he obtained his Iowa license, he worked in Canada doing *locum tenens,* which is temporary substitution work for vacationing physicians.

When Dr. dePape learned that he would be granted his Iowa medical license, he and Trimark were finally able to set a firm start date. Trimark then worked with Blumenfeld to arrange a June 8, 2000 entry at the Peace Bridge in Buffalo, New York, which Blumenfeld chose because of

---

7. Blumenfeld's "cut and paste" mistakes are not limited to the two references to Dr. Dieppe. The TN letter concludes with a reference to Dr. MacDonald where it should read Dr. dePape—further evidence that Blumenfeld had employed the identical community health care needs assessment on prior Canadian physician TN entries.

its arrangement with a particular INS officer. Dr. dePape ended his lease, shipped all of his belongings and his vehicle to Fort Dodge, and terminated his *locum tenens.* He and his fiancée made arrangements to travel the nearly 3,000 miles from Dr. dePape's home in British Columbia to Buffalo, New York. In this regard, they flew from Vancouver to Toronto, and then rented a car to drive to Buffalo, New York. They planned to drive across the border, drop the car off at the rental station in Buffalo, and then fly to Fort Dodge, Iowa, where Dr. dePape intended to begin his new life.

When Dr. dePape arrived at the Peace Bridge on June 8, 2000, he was filled with all the hopes and expectations of living out his "American dream." He had worked his entire adult life to become a family physician, and he was on the verge of realizing this goal. He had negotiated an extraordinarily advantageous contract with Trimark that not only was financially lucrative, but also promised to provide him with a challenging and fulfilling career. He had visited Fort Dodge on two previous occasions and was eager to move to the new community and to work with the other physicians at Trimark. When Dr. dePape arrived at the Peace Bridge, he literally had nothing more than the clothes on his back.

Because the costs of accompanying Dr. dePape to his INS interview at the Peace Bridge were prohibitively high, Blumenfeld, consistent with its usual practice, retained its local immigration lawyer, Mr. Eiss, to assist Dr. dePape. Mr. Eiss met Dr. dePape at a coffee shop near the INS office in Fort Erie, Canada on the morning of June 8, 2000. There, for the first time, Dr. dePape was shown the letter describing his position as a Physician Consultant and told that he could not work in the United States as a family physician. Prior to meeting with Mr. Eiss, Dr. dePape

knew the name of the visa on which he was entering the United States, and he knew that the visa was temporary—that is all he knew because that is all Blumenfeld had told him. Neither Partner A nor Partner B ever discussed with Dr. dePape the TN visa's severe limitations on direct patient care or the notion of a community health care needs assessment, nor did they send him a copy of the TN visa application letter.

In fact, the only time Dr. dePape spoke with a Blumenfeld partner directly was in March of 2000, and that conversation lasted one-tenth of one hour. During that short conversation, Partner B told Dr. dePape that he would be entering the United States on a TN visa, that this visa was temporary but easily renewable while he waited for his "green card," and that Dr. dePape would meet with Mr. Eiss before the entry to discuss the logistics of Dr. dePape's entry. Although it would have been incredibly late in the process, even in this conversation Blumenfeld failed to inform Dr. dePape that he could not come to the United States to be a family physician.

At the coffee shop on June 8, 2000, Mr. Eiss's charge was to prepare Dr. dePape for his INS interview. Mr. Eiss spent 20 minutes with Dr. dePape. During this short meeting, Mr. Eiss played the role of an immigration officer and asked Dr. dePape what he was planning on doing in the United States. Dr. dePape responded that he was going to be a family physician. Mr. Eiss shook his head and handed Dr. dePape the TN application letter. Dr. dePape was shocked, surprised, and outraged by the letter's description of his position and its temporary nature because, as far as he knew, he was permanently moving to Fort Dodge to be a doctor, not a temporary Physician Consultant doing a community health care needs assessment—something he had never heard about or even

knew what it was. Dr. dePape was skeptical and concerned about the lawfulness of representing to INS that he intended to perform a community health care needs assessment and then return to Canada. However, Mr. Eiss convinced Dr. dePape that the community health care needs assessment was legal and only a mere technicality that would not impede him from practicing medicine. Hesitant but confident in the legal advice of his attorney, Dr. dePape proceeded with Mr. Eiss to the INS office to attempt Dr. dePape's entry under TN status.

There, the INS official interviewing Dr. dePape did not believe that Dr. dePape sought entry to perform a community health care needs assessment. When the INS official asked Dr. dePape directly why he was going to the United States, Dr. dePape truthfully answered that he intended to practice family medicine. Because the TN visa does not permit this, the INS official turned Dr. dePape away and sent him back to Canada. Mr. Eiss did not return with Dr. dePape to counsel him further.

Devastated and shocked by his failed entry and with no direction from Mr. Eiss or the Blumenfeld firm, Dr. dePape found a pay phone and called Ms. Hutto. She advised him to wait thirty minutes and to try to enter the United States as a visitor. If he accomplished that, she instructed him to drop the rental car off at the Buffalo airport and to fly to Fort Dodge in order to work out a "plan B." Dr. dePape and his fiancée followed Ms. Hutto's advice, but the INS officials immediately recognized Dr. dePape. The officials not only interrogated him and accused him of being a liar, they searched his car and belongings and Dr. dePape and his fiancée felt as if they were being treated like criminals. INS again denied Dr. dePape entry to the United States, told him not to come back, and

escorted him back to Canada. Dr. dePape felt helpless, humiliated, and angry.

When that entry attempt failed, Dr. dePape was literally stranded. He had no job, no home, and no possessions—not even his medical bag. Fortunately, he had a credit card with him and, at his own expense, he and his fiancée drove back to Toronto, where they paid over two thousand U.S. dollars for last-minute plane tickets back to Vancouver. Throughout this entire ordeal, there was no backup contingency plan and no advice from Blumenfeld.

Ultimately, Dr. dePape returned to British Columbia and, in his words, "re-started his life." He made several attempts to contact Trimark, but no one at Trimark returned his phone calls until August 17, 2000. On that day, Ms. Hutto implored Dr. dePape to attempt another entry in Buffalo, New York, but he refused. She then asked if he was willing to take the USMLE's, but because he labored under the impression that the exams would have taken years to complete, he refused that option as well. Instead, Dr. dePape explored his employment options in Canada and ultimately began his own private practice in October of 2001.

Shockingly, no one at Blumenfeld ever attempted to contact Dr. dePape after his failed entry attempt on June 8, 2000.

Finally, the record also reveals that Blumenfeld maintained sub-adequate communication with Trimark as well as with Dr. dePape. Dr. Whitters wrote Blumenfeld on two separate occasions to request updates as to the status of Dr. dePape's immigration. In a letter dated February 28, 2000, Dr. Whitters informed Blumenfeld that Trimark would not process further invoices until Blumenfeld provided monthly progress reports regarding Dr. dePape's visa status. [Trimark exh. 123]. This letter reiterated a January 28, 2000

letter, in which Dr. Whitters similarly requested progress reports. [Trimark exh. 119].

And while Partner B testified that she was in frequent contact with Ms. Hutto and that Blumenfeld relied on Ms. Hutto to convey information to Dr. dePape, the evidence shows that Blumenfeld did not maintain acceptable levels of contact with her either. In an email to Partner B, dated December 16, 1999, Ms. Hutto asked Partner B for an update on Dr. dePape's immigration and for information to obtain a Social Security number for him. On December 20, 1999, Partner B responded, but did not provide an update; instead, she merely informed Ms. Hutto that Dr. dePape would not be able to apply for a Social Security number until he was physically present in the United States. She notably did not provide Trimark with the requested update.

On February 17, 2001, Ms. Hutto again emailed Partner B, indicating that she had not heard from Partner B since the December 20, 2000 email. For both Trimark and Dr. dePape, the status of Dr. dePape's immigration was critical. Trimark could not schedule Dr. dePape's patients without knowing approximately when to expect Dr. dePape's arrival. The status of his immigration was particularly important to Dr. dePape because he needed to inform his Canadian employer of his separation date, as well as needing adequate time to terminate the lease of his residence in Canada, arrange for a new residence in Fort Dodge, and to ship his belongings to the United States. Blumenfeld was not forthcoming with this information and never explained to Dr. dePape, or Trimark for that matter, the immigration process, Dr. dePape's immigration options, or the significance of pursuing a TN visa.

## III. CONCLUSIONS OF LAW

*(Including some additional findings of fact )*

The court will begin its analysis of the merits of the plaintiff's case beginning with Dr. dePape's causes of action against Trinity and Trimark. However, as a preliminary matter, the court notes that Iowa law applies to this lawsuit, which is in federal court based on diversity of citizenship. The parties do not argue that anything other than Iowa law should apply, and the court concludes that application of Iowa law to Dr. dePape's claims is warranted.

 A federal court must apply the choice of law rules of the forum state in which it sits—in this case, Iowa. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Iowa law employs the Second Restatement's "most significant relationship" test. *See, e.g., Veasley v. CRST Intern., Inc.,* 553 N.W.2d 896, 897 (Iowa 1996) (recognizing Iowa's adoption of the "most significant relationship" test); *Cameron v. Hardisty,* 407 N.W.2d 595, 597 (Iowa 1987) (same); *Cole v. State Auto. & Cas., Underwriters,* 296 N.W.2d 779, 781–82 (Iowa 1980) (same); *Berghammer v. Smith,* 185 N.W.2d 226, 231 (Iowa 1971) (same). Here, the court finds that Iowa has the most significant relationship to the parties' disputes because the contractual relationships were formed in Iowa, the contract between Dr. dePape and Trimark has a choice-of-law provision, which identifies Iowa law as the governing law, the parties intended contractual performance to take place in Iowa, and Trimark and Trinity are incorporated in Iowa. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (absent choice by parties, court should consider place of contracting, of negotiation, of performance, of contract's subject matter, and parties' domiciles, residences, na-

tionalities, places of incorporation, and places of business).

### A. Count I: Promissory Estoppel

Dr. dePape argues that Trimark and Trinity are liable because they promised to secure governmental permission for him to practice medicine in the United States and to make arrangements for that permission in a correct, legal, and appropriate manner. Because the terms of the Employment Agreement do not contain this provision, the plaintiff relies on the equitable doctrine of promissory estoppel to enforce the alleged promises. He alleges that Mr. Grandgeorge verbally promised him that Trimark would assume responsibility for successfully obtaining the appropriate immigration documentation for Dr. dePape to live and work in the United States.

■ The essential elements of promissory estoppel are well-established. These elements are: "(1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise." *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999).

The threshold requirement is that a promise was made: "In order for the doctrine of promissory estoppel to come into effect there must, of course, be a promise on which reliance may be based...." 28 AM. JUR.2d *Estoppel and Waiver* § 48, at 658 (1966). The Iowa Supreme Court recently defined "clear and definite promise":

> A "promise" is "[a] declaration ... to do or forbear a certain specific act." *Black's Law Dictionary* 1213 (6th ed.1990). A promise is "clear" when it is easily understood and is not ambiguous. *See* Webster's Third New International Dictionary 419 (unab.ed.1993). A promise is "definite" when the assertion is explicit and without any doubt or tentativeness. *See id.* at 592.

*Schoff*, 604 N.W.2d at 50–51.

■ Under Iowa law, the party asserting the doctrine of promissory estoppel as its theory of recovery has the burden of proving this theory, and "strict proof of all elements is required." *National Bank of Waterloo v. Moeller*, 434 N.W.2d 887, 889 (Iowa 1989) (citing *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 39 (Iowa 1977)). Therefore, here, Dr. dePape bears the burden of proving that Trimark promised to successfully secure governmental permission to practice medicine in the United States on his behalf. However, the evidence presented falls far short of proof, by any standard, of the existence of a clear and definite promise upon which promissory estoppel can be based. Therefore, Dr. dePape's promissory estoppel claim cannot lie.

Dr. dePape's assertion that Trimark promised to obtain lawful entry into the United States for Dr. dePape is entirely unsupported by the record. The record is bereft of any evidence of such a promise. Not even the plaintiff testified that Trimark and Trinity promised to do anything apart from engaging the services of a law firm and assuming the costs of his immigration expenses. Instead, it was clear from Mr. Grandgeorge's March 11, 1999 memorandum to Dr. dePape, [Pf. exh. 4], as well as from Mr. Rhiner's subsequent letter, [Pf. exh. 8], that Trimark promised to retain an immigration lawyer to assist Dr. dePape with his immigration and to pay the legal fees.

The parties clearly hoped that the immigration process would proceed smoothly and that Dr. dePape would obtain a visa.

However, the parties' mutual agreement upon a goal does not give rise to a clear and definite promise. *See Simmons Poultry Farms, Inc. v. Dayton Road Dev't Co.,* 82 F.3d 217, 220–21 (8th Cir.1996). In *Simmons Poultry Farms, Inc. v. Dayton Road Development Co.,* the plaintiff, a turkey processor, argued that the defendant, Simmons Poultry, orally guaranteed to supply 50,000 pounds of turkey per week for processing. *Id.* at 220. The parties had an agreement whereby Simmons Poultry would supply the plaintiff with turkey, but Simmons Poultry argued that the 50,000 pounds figure was a goal, rather than a guarantee, that both parties hoped to achieve. *Id.* at 220–21. The Eighth Circuit agreed and held that the evidence supported the existence of a 50,000 goal or projection, but not an enforceable guarantee or promise. *Id.* at 221.

Similarly, Trimark and Dr. dePape expected that the immigration process would prove successful for Dr. dePape. Mr. Grandgeorge articulated this mutual aspiration in a separate March 11, 1999 memorandum to Dr. dePape. He stated that *"[h]opefully* things will go well with immigration and we'll see you soon during the visit to locate housing." [Pf. exh. 3] (emphasis added). The testimony presented at trial is consistent with this mutual goal. No one expected the immigration process to go sour, and both Trimark and Dr. dePape were prepared to fulfill the terms of the Employment Agreement.

The hope and expectation of securing the proper immigration documentation simply do not rise to the level of a "clear and definite promise." Trimark fulfilled the only promises it made to Dr. dePape:

it retained an immigration firm and assumed the cost of all legal fees associated with Dr. dePape's immigration matters. Moreover, the court cannot conceive of any reason why Trimark would have done anything to prejudice Dr. dePape's chances of obtaining lawful entry to the United States. Probably more so than the plaintiff himself, Trimark wanted Dr. dePape to come to the United States to practice medicine with the Trimark Physicians Group. Trimark perceived the employment relationship to be a great "fit," and it did everything within its power to facilitate Dr. dePape's immigration. Because there is no evidence to support a finding of a clear and definite promise, Dr. dePape's promissory estoppel claim must fail, and the court need not discuss the remaining elements of this claim.[8]

### B. Count II: Breach–of–Contract

Dr. dePape also asserts that Trimark entered into a written agreement whereby it promised, among other things, to pay compensation and other benefits to Dr. dePape and to provide him with the immediate opportunity for the development of his medical practice for a period of at least five years. [Pf. Complaint]. Dr. dePape alleges that Trimark breached this agreement, but Trimark denies this allegation on the ground that performance of the Employment Agreement was impossible in light of the fact Dr. dePape did not obtain permission to work in the United States.

█ In a breach-of-contract claim, the plaintiff must prove:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and

---

**8.** Trimark also argued in its pre-trial and post-trial briefs that the parol evidence rule bars consideration of evidence outside the four corners of the parties' fully integrated Employment Agreement. However, because the court finds that, even when extrinsic evidence is considered, Trimark did not promise Dr. dePape to secure governmental permission for him to enter into and work in the United States, the court will not address Trimark's parol evidence argument.

conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)).

■ The parties do not dispute that they entered into a valid contract that would have provided Dr. dePape with the opportunity to advance his medical career. However, Trimark was not at fault for the nonperformance because Dr. dePape never gained INS permission to work in the United States. While governmental permission was not an express condition precedent to performance, Dr. dePape's availability to work was a basic assumption of both parties, and all were aware of the need to comply with federal immigration law. Dr. dePape was not available to work because he did not secure the necessary governmental permission to do so.

■ "The doctrine of impossibility of performance is recognized in Iowa as an excuse for nonperformance generally where that which has been promised becomes [o]bjectively impossible to perform due to no fault of the nonperforming party." *Nora Springs Coop. Co. v. Brandau*, 247 N.W.2d 744, 747 (Iowa 1976). Iowa courts employ the Restatement's approach of impossibility. *See American Soil Processing, Inc. v. Iowa Comprehensive Petroleum*, 586 N.W.2d 325, 330 (Iowa 1998) (citing RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981)). This approach provides for discharge of a contractual obligation when there is a supervening impracticability:

"Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."

*Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261). "This rule recognizes that even though a party in assuming a duty has not qualified the language of the party's undertaking, the court may still relieve the party of that duty 'if performance has unexpectedly become impracticable as a result of a supervening event.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. a, at 313).

In the comments to the Restatement, the authors opine that the doctrine of impossibility is unavailable as a defense when the party invoking the doctrine caused the events that made his or her performance impracticable. RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. d, at 316. In his post-trial brief, the plaintiff asserts that, while the evidence is slim, the court could conclude that Trimark was at fault for Dr. dePape's failed entry and, therefore, that the doctrine of impossibility is unavailable. The court finds by the greater weight of the evidence, however, that Trimark was not at fault for causing the break-down of Dr. dePape's immigration process. Trimark did everything that the Blumenfeld firm asked of it to assist in Dr. dePape's immigration to the United States. While Dr. dePape argues that Trimark should have been more diligent in ascertaining the requirements of a TN visa, the court does not agree. Nor does the court believe that further inquiry would have impacted Trimark's actions in this case. This is so because, based on Blumenfeld's counsel, the approach Blumenfeld was taking with the TN visa was "aggressive," but legal. Under these circumstances, it cannot be said that Trimark must shoulder the blame for Dr. dePape's inability to obtain a TN visa.

The uncontroverted evidence in this case shows that Trimark acted competently and in good faith in handling Dr. dePape's immigration. Through no fault of either Trimark or Dr. dePape, Dr. dePape did not obtain a visa to enter the United States: INS made an independent determination that Dr. dePape did not qualify for a TN visa. Under these circumstances, neither party could fulfill its duty of performance under the Employment Agreement. Accordingly, Trimark is relieved of its obligation to perform. Consequently, the court finds in favor of Trimark on the plaintiff's breach-of-contract claim.

### C. Count III: Negligence

In the plaintiff's third count, he alleges that both Trimark and Trinity assumed a duty to obtain governmental permission for him to practice medicine in the United States and to make the necessary arrangements for that permission in a correct, legal, and appropriate manner.

The Iowa Supreme Court has explained the general principles of a negligence claim:

"The elements of a negligence claim include the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995); *see also* W. Page Keaton, *Prosser and Keaton on Torts* § 30, at 164 (5th ed.1984). Courts look to legislative enactments, prior judicial decisions, and general legal principles as a source for the existence of a duty. *See Engstrom v. State*, 461 N.W.2d 309, 315 (Iowa 1990). Our court has often relied on the Restatement (Second) of Torts "when determining whether a given defendant owes a duty to a plaintiff and the scope of that duty." *Shaw v. Soo Line R.R.*, 463 N.W.2d 51, 55 (Iowa 1990). Ultimately, though, the existence

of a duty is a policy decision, based on the relevant circumstances, that the law should protect a particular person from a particular type of harm. *See Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 285 (Iowa 1981).

*Van Essen v. McCormick Enterprises Co.*, 599 N.W.2d 716, 718–19 (Iowa 1999).

The threshold determination in any negligence case is whether the defendant owed the plaintiff a duty of care. *Rieger v. Jacque*, 584 N.W.2d 247, 250 (Iowa 1998). Here, Dr. dePape argues that Trimark and Trinity voluntarily assumed the duty to secure his entry into the United States. As part of this duty, Trimark and Trinity hired the Blumenfeld law firm, which the plaintiff then argues carried out its duties negligently. Dr. dePape seeks to impute Blumenfeld's negligence to Trinity and Trimark, arguing that Trinity and Trimark are vicariously liable. In his pretrial and post-trial briefs, the plaintiff cites *Petersen v. Farmers Casualty Co.*, 226 N.W.2d 226 (Iowa 1975), in support of this argument.

In *Petersen*, the plaintiff brought an action against his insurance company to recoup his loss allegedly resulting from the failure of the insurance company's lawyer to perfect an appeal from judgment in excess of coverage. *Id.* at 228. Giving rise to that case was a lawsuit against the plaintiff for an automobile accident. *Id.* At that time, the plaintiff was insured by a policy issued by the defendant with personal injury limits of $25,000. *Id.* Because the lawsuit against the plaintiff exceeded the policy limits, he employed his own attorney to protect his interests, but the insurance company's lawyer conducted the litigation. *Id.* After the jury returned a verdict against the plaintiff, the insurance company's lawyer informed him that the insurance company was going to appeal the adverse judgment. *Id.* Relying

on this assurance, the plaintiff did not independently file an appeal. *Id.* However, the insurance company's lawyer did not perfect the appeal, and it, therefore, was dismissed, making the judgment against the plaintiff final. *Id.*

The plaintiff subsequently prevailed in a jury trial against the insurance company in which he alleged negligence. *Id.* The pertinent issue before the Iowa Supreme Court was whether the negligence of the insurer's attorney could be imputed to the insurer. *Id.* Expressly limiting its decision to the situation in which a plaintiff is denied the right to appeal by the negligence of the insurer's attorney, the Iowa court held that the attorney's negligence was imputable to the insurer. *Id.* at 231. The court emphasized that it "express[ed] no opinion as to the vicarious liability of an insurer to the insured for negligence of the insurer's attorney in the defense of a claim under the policy provisions which reserve that right to the insurer." *Id.*

The gravamen of the *Petersen* court's holding was not that the insurer's attorney was negligent in his handling of the merits of the case, trial tactics, or strategy. This duty to defend arose out of the insurance policy, and any negligence in performing that contractual obligation was not before the court. Instead, the court was presented with a situation in which the insurer, not the insured's attorney, voluntarily assumed the responsibility of appealing the adverse judgment against it and was aware of the plaintiff's reliance on that decision.

■ The *Petersen* decision is inapposite to Dr. dePape's case for two reasons. First, in Dr. dePape's case, the only duty Trinity and Trimark owed to Dr. dePape was a contractual duty—to retain a law firm to assist with Dr. dePape's immigration. Neither Trinity nor Trimark voluntarily assumed a duty to secure Dr. dePape's visa.

Second, the *Petersen* case involved an insurer that decided to appeal—an obligation it had no duty to undertake. It bears repeating that the insurer was held liable because it decided to appeal and then "lull[ed] the plaintiff into a sense of security," thereby depriving the plaintiff of his opportunity to assert his legal rights. *See id.* at 230. Under circumstances in which the insurer's decision prejudiced the plaintiff, the Iowa court ruled that it would be unjust for the insurer to claim immunity because its lawyer negligently failed to perfect the appeal. *Id.* In Dr. dePape's case, Trimark and Trinity did not deprive Dr. dePape of any rights by merely retaining the Blumenfeld firm. They hired a reputable firm and reasonably relied on its legal counsel.

The court can envision a hypothetical situation that might warrant a different result. For example, suppose Dr. dePape had taken and passed the USMLE's and, thus, was qualified to enter the United States on an H–1B visa. And further suppose that the Blumenfeld firm advised Trinity and Trimark about the differences between and the feasibility of the H–1B visa and the TN visa. If, without consulting Dr. dePape, Trinity and Trimark had directed the Blumenfeld firm to pursue the TN visa, despite their knowledge of the fact that Dr. dePape's job (as described in the Employment Agreement) was not a tenable interpretation of the TN visa, it is conceivable that Trinity and Trimark could be held vicariously liable for Blumenfeld's negligence.

Nevertheless, what differentiates this hypothetical fact pattern from the facts of this case is that neither Trinity nor Trimark made such an independent and informed determination that prejudiced Dr. dePape's immigration prospects. In this case, Trinity and Trimark retained the Blumenfeld firm and reasonably relied on its legal counsel. There is no basis in law

or in fact to hold Trinity and Trimark liable for Blumenfeld's negligence.

Furthermore, Trimark rightly points out in its pre-trial and post-trial briefs that a cause of action in negligence generally will not lie if the duty element of the negligence claim can be established only by resort to a contractual obligation. *See, e.g., Goebel v. Dean & Assocs.*, 91 F.Supp.2d 1268, 1279–80 (N.D.Iowa 2000) (recognizing that not every breach of contract gives rise to a tort claim under Iowa law, but allowing negligence claim to go forward because duty existed independent of contractual obligation); *Haupt v. Miller*, 514 N.W.2d 905, 910 (Iowa 1994) (stating that not all contractual duties will give rise to an action in tort, but finding that an independent duty existed); *Preferred Mktg. Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389, 397 (Iowa 1990) (rejecting negligent breach of contract claim and stating duty in tort action must be distinct from the duty imposed by the contract). In rejecting a negligent breach of contract claim, the Iowa Supreme Court explained:

> We have recognized that under some circumstances, breach of a contractual duty may give rise to an independent action in tort. *See, e.g., Duke v. Clark*, 267 N.W.2d 63, 68 (Iowa 1978) (tenant versus landlord); *Giarratano v. Weitz Co.*, 259 Iowa 1292, 1305, 147 N.W.2d 824, 832 (1967) (employee of subcontractor versus general contractor with control over workplace and safety). We have rejected the suggestion that every breach of contract gives rise to an action in tort. *See M & W Farm Serv. Co. v. Callison*, 285 N.W.2d 271, 276 (Iowa 1979). Only where a duty recognized by the law of torts exists between the plaintiff and defendant distinct from a duty imposed by the contract will a tort ac-

tion lie for conduct in breach of the contract. As Prosser stated:

> [I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not.

W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 33, at 205 (1st ed.1941). *See also* W. PROSSER, THE LAW OF TORTS § 92 (W.P. Keeton 5th ed. 1984 & Supp. 1988) (maintaining distinction); 57A AM. JUR.2d *Negligence* § 119 (1989) ("Ordinarily, a breach of contract is not a tort.... [But] negligent performance of a contract may give rise to an action in tort, if the duty exists independently of the performance of the contract.") (citations omitted); *Hart v. Ludwig*, 347 Mich. 559, 79 N.W.2d 895 (1956) (recognizing rule); *Layman v. Braunschweigische Maschinenbauanstalt, Inc.*, 343 N.W.2d 334 (N.D.1983) (same); *Landwehr v. Citizens Trust Co.*, 110 Wis.2d 716, 329 N.W.2d 411 (1983) (same).

*Preferred Mktg.*, 452 N.W.2d at 397.

Here, there simply is no relationship between Dr. dePape and Trinity and Trimark that gives rise to a legal duty to obtain governmental permission for Dr. dePape to work in the United States. *See Engstrom*, 461 N.W.2d at 315 (listing legislative enactments, prior judicial decision, and general legal principles as sources of a duty). The only duty arises out of their contractual relationship, and that duty was not performed negligently. Therefore, a negligence claim against Trinity and Trimark is not cognizable under these circumstances; if Dr. dePape were able to recover on the theory that Trinity and Trimark assumed a duty to secure a visa for him, that cause of action would lie in contract, not in tort. Accordingly, the court finds in favor of Trinity and Trimark on Count III of Dr. dePape's complaint.[9]

---

9. Because the court found in favor of Trinity and Trimark on each of the counts asserted

against them, the court need not address Trin-

The court addressed each of the claims in some detail because the plaintiff briefed them and because it is the court's usual practice to address all arguments raised— *not* because the court believed that the claims and arguments have any factual or legal basis. It should have been abundantly clear at the conclusion of discovery, if not in the initial pleading stage, that no factual or legal basis could support a valid claim against Trinity and Trimark. Each of the claims against Trinity and Trimark border on, if not exceed, Federal Rule of Civil Procedure 11 liability. However, in the absence of Trinity and Trimark seeking Rule 11 sanctions, this court declines to award them *sua sponte.*

### D. Count IV: Legal Malpractice

The eleventh hour amendment to Dr. dePape's complaint avers that the Blumenfeld law firm was negligent in its handling of Dr. dePape's immigration. Specifically, Dr. dePape alleges that Blumenfeld breached its duty to him by "(1) failing to properly perform the immigration services; and (2) by failing to properly communicate with and advise him." [Pf. amended complaint, at ¶ 36]. Blumenfeld, of course, denies these allegations and argues that it did not breach any duty owed to Dr. dePape. Furthermore, the firm asserts that, even if a duty were breached, there is no connection between the alleged breach and Dr. dePape's damages.

 It is well-established that an attorney-client relationship may give rise to a duty, the breach of which may be legal malpractice. In a legal malpractice case, the plaintiff must demonstrate:

> (1) the existence of an attorney client relationship giving rise to a duty, (2) the attorney, either by an act or failure to act, violated or breached that duty, (3)

the attorney's breach of duty proximately caused injury to the client, and (4) the client sustained actual injury, loss, or damage.

*Ruden v. Jenk,* 543 N.W.2d 605, 610 (Iowa 1996); *see also Vande Kop v. McGill,* 528 N.W.2d 609, 613 (Iowa 1995); *Schmitz v. Crotty,* 528 N.W.2d 112, 115 (Iowa 1995); *Dessel v. Dessel,* 431 N.W.2d 359, 361 (Iowa 1988); *Burke v. Roberson,* 417 N.W.2d 209, 211 (Iowa 1987); *see also Kubik v. Burk,* 540 N.W.2d 60, 63 (Iowa Ct.App.1995); *Benton v. Nelsen,* 502 N.W.2d 288, 291 (Iowa Ct.App.1993). In this case, there is no dispute that an attorney-client relationship (the first element) existed between Dr. dePape and Blumenfeld. Blumenfeld, however, asserts that Dr. dePape cannot establish the remaining three elements of his legal malpractice claim. The court will address these elements in turn.

### 1. Failure to pursue H–1B visa

The court can easily dispose of Dr. dePape's first contention that Blumenfeld breached its duty of care when it failed to properly perform immigration services by failing to pursue an H–1B visa. There is no question that Dr. dePape was not eligible for an H–1B visa because he had not taken the requisite examinations—the USMLE's. There is also no question that Blumenfeld was negligent when it failed to advise Dr. dePape of the consequences of not taking the USMLE's and failed to correct his misconception about the length of time the exams took to complete.

However, the record is devoid of any evidence establishing that Dr. dePape would have taken the USMLE's and become eligible for an H–1B visa if Blumenfeld had advised him to do so. Thus, this

ity and Trimark's third-party complaint against the Blumenfeld law firm for contribu-

tion and indemnity.

claim fails for lack of causation. Instead, the heart of Dr. dePape's legal malpractice claim lies in his argument that Blumenfeld breached its duty to Dr. dePape by failing to communicate with and properly advise him, especially concerning the severe limitations of the TN visa.

### 2. Failure to communicate and advise

### a. Breach of duty

 The second element a plaintiff must establish in a legal malpractice suit is that the attorney breached the duty of care owed to his or her client. *E.g., Schmitz,* 528 N.W.2d at 115. Here, Dr. dePape argues that Blumenfeld owed him a duty to properly communicate with and advise him. Blumenfeld contends that it did not breach this duty and that it had, in fact, adequately counseled him. "An attorney breaches the duty of care owed to the client when the attorney fails to use 'such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the task which [is undertaken].'" *Id.* (quoting *Martinson Mfg. Co. v. Seery,* 351 N.W.2d 772, 775 (Iowa 1984)) (alteration provided by *Schmitz* court). Expert testimony is generally required to establish that an attorney's conduct is negligent, but, when the negligence is so obvious that a layperson can recognize or infer it, such testimony is unnecessary. *Kubik v. Burk,* 540 N.W.2d 60, 64 (Iowa Ct.App.1995) (citing *Benton,* 502 N.W.2d at 290) (citing *Martinson Mfg. Co.,* 351 N.W.2d at 775); *accord Schmitz,* 528 N.W.2d at 116 n. 1 (noting that expert testimony is generally required in attorney malpractice cases and that it was provided but, in hindsight, unnecessary in that case because breach of standard of care was obvious).

 In this case, the plaintiff offered the deposition testimony of Bart Chavez to establish Blumenfeld's negligence. The court has reviewed Mr. Chavez's deposition, and his testimony strongly supports a finding of negligence in this case. Moreover, the court finds that Blumenfeld's breach is of the ilk that does not necessitate expert testimony because it is so obvious and outrageous that a lay person could easily recognize it without the assistance of an expert. Even in the absence of Mr. Chavez's expert testimony, which clearly identifies and articulates a standard of care that Blumenfeld failed to meet, the court is not without guidance in assessing the level of care Blumenfeld is charged with maintaining. "Although the Iowa Code of Professional Responsibility for Lawyers does not undertake to define standards of civil liability, it constitutes some evidence of negligence." *Ruden v. Jenk,* 543 N.W.2d 605, 611 (Iowa 1996) (citing *Menzel v. Morse,* 362 N.W.2d 465, 471 (Iowa 1985) ("Standards of conduct and practice may be evidenced by ... the Code of Professional Responsibility for Lawyers.") (citation omitted)); *accord Dessel v. Dessel,* 431 N.W.2d 359, 361 (Iowa 1988) ("[T]he 'code of professional responsibility sets the standard for an attorney's conduct in any transaction in which his professional judgment may be exercised.'") (quoting *Cornell v. Wunschel,* 408 N.W.2d 369, 377 (Iowa 1987)). The Missouri Code of Professional Conduct likewise serves as a yardstick in determining whether a lawyer breached his or her duty owed to a client. *See McRentals, Inc. v. Barber,* 62 S.W.3d 684, 697 (Mo.Ct.App. 2001) ("Although violations of Rule 4–1.8(a) do not create a private cause of action for a client, the rule provides guidance in determining the fiduciary duty owed to a client by an attorney.") (citing *Greening v. Klamen,* 652 S.W.2d 730, 734 (Mo.Ct.App. 1983)).

Because Partners A and B are subject to the Missouri Rules of Professional Conduct, the court will utilize them as a guidepost.[10] Accordingly, the minimum

---

**10.** While Iowa law applies to the substantive issues presented in this case, Partners A and

communication Blumenfeld should have maintained with Dr. dePape is as follows:

4–1.4. Communication

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Mo. R. Prof'l Conduct 4–1.4 (2002).

The comment on the communication rule further explains:

The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so.... Even when a client delegates authority to the lawyer, the client should be kept advised of the status of the matter. Adequacy of communication depends in part on the kind of advice or assistance involved. For example, in negotiations where there is time to explain a proposal, the lawyer should review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that might injure or coerce oth-

ers. On the other hand, a lawyer ordinarily cannot be expected to describe trial or negotiation strategy in detail. The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirement as to the character of representation. Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult.... Where many routine matters are involved, a system of limited or occasional reporting may be arranged with the client. Practical exigency may also require a lawyer to act for a client without prior consultation.

*Id.,* at R. 4–1.4 cmt.

In fact, Blumenfeld itself understands the importance of communication with its clients, and it prides itself on maintaining regular client contact. Indeed, the "letterhead" on *each link* of Blumenfeld's webpage advertises that Blumenfeld "recognize[s] the importance of personal contact with clients as an integral part of being a responsive firm." Blumenfeld, Kaplan & Sandweiss, P.C. law firm website, <*www.bks-law.com*>.

Here, Blumenfeld argues that Dr. dePape was adequately informed by, if nothing else, his meeting with Mr. Eiss at the

B are subject to Missouri's ethical code. *See* Mo. R. Prof'l Conduct 4–8.5. Arguably, Partners A and B were also subject to the Iowa Code of Professional Responsibility for Lawyers during their representation of Dr. dePape, Trinity, and Trimark, but this is a nettlesome question that the court need not decide because this case does not hinge on either state's particular rule governing communication requirements. Missouri follows the Model Rules of Professional Responsibility, while Iowa employs the Model Code of Professional Conduct. Iowa's code has no direct counterpart to Missouri's rule on communication. However, read together, three provisions in the Iowa Code of Professional Responsibility for Lawyers encompass the same aspirations envisioned by the drafters of the rule on communication. DR 6–101(A)(3) provides that a lawyer shall not "neglect a legal matter entrusted to him." EC 7–8 states that "a lawyer should exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations." Finally, EC 9–2 states that "a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client."

Canadian/United States border on the day of the failed entry attempt. Moreover, Blumenfeld contends that it held more conferences with Dr. dePape than it has record of. It argues that it sufficiently explained the visa application process to Dr. dePape in these undocumented conferences. The court strongly disagrees. As a finding of fact, the court finds that Blumenfeld held only one conference with Dr. dePape and that that conference lasted 1/10 of an hour. As the comment to Missouri's Rule 4.1–4 on communication indicates, "[t]he client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. . . ." *Id.* It would have been impossible to fulfill this duty and to inform Dr. dePape about the visa process in the six minutes Blumenfeld spoke with Dr. dePape. Furthermore, the court finds that Blumenfeld did not undertake this task during this sole conference, because the court finds that, during this conference, Partner B did not discuss substantive matters with Dr. dePape, but rather merely discussed logistical and scheduling matters of the entry attempt.

That Blumenfeld breached its duty of communicating with and advising Dr. dePape does not present the court with a close call. Because Dr. dePape had *no information,* he indisputably lacked sufficient information upon which to make an informed decision about his immigration. A 20 minute meeting with Mr. Eiss at the border on the morning of Dr. dePape's entry attempt, which was preceded by months of silence, did not cure Blumenfeld's failure to communicate with Dr. dePape because, by that time, it was too late for Dr. dePape to make an informed decision regarding his immigration to the United States. Moreover, the only decision Dr. dePape was ever allowed to make was the one he was faced with at the

border—lie and proceed with the immigration charade or tell the truth and be rejected.

Blumenfeld also asserts that it was in frequent contact with Ms. Hutto, that it relied on her to convey information to Dr. dePape, and, therefore, that Blumenfeld sufficiently advised Dr. dePape. The evidence establishes otherwise. Not only did Blumenfeld shirk its duty of advising Dr. dePape, the record demonstrates that Blumenfeld did not maintain acceptable levels of contact with Ms. Hutto either.

Furthermore, the court is offended by Blumenfeld's attempt to place responsibility for its failure to communicate with Dr. dePape on Ms. Hutto. First, Blumenfeld's duty to its client is Blumenfeld's alone, which it admitted at trial. Second, Ms. Hutto was a recent college graduate. Despite her competence in recruiting Dr. dePape, she simply lacked any training in immigration law and, therefore, could not be expected to be qualified to inform Dr. dePape about the complex immigration process. Moreover, there is not a scintilla of evidence in the trial record that Blumenfeld instructed Ms. Hutto to pass on information from Blumenfeld to Dr. dePape. Blumenfeld merely *assumed* that Ms. Hutto would relay information to Dr. dePape, and Blumenfeld, furthermore, never attempted to make sure that she had followed through with this assumed charge.

While there are a myriad of ways Blumenfeld could have fulfilled its obligation to Dr. dePape, there is no question that Blumenfeld's failure to communicate at all with Dr. dePape is inadequate to meet its obligation under any conceivable option. *See* MO. R. PROF'L CONDUCT 4–1.4. For example, Blumenfeld could have (1) sent a copy of the retention letter to Dr. dePape, (2) written Dr. dePape a follow-up letter to the initial conference explaining the re-

quirements of the TN and the H–1B visas, (3) followed-up the written explanation with a telephone call to ensure that Dr. dePape understood the visa requirements and to answer any questions that Dr. de-Pape may have had, and (4) if it was not intended to be a sham, explained the community health care needs assessment to the hospital to determine if they needed or wanted it and to Dr. dePape to determine if he was ready, willing, and able to perform it. Because Blumenfeld failed to do anything to explain Dr. dePape's immigration options and their requirements and, in addition, sprung the community health care needs assessment on Dr. dePape at the border, the court finds that Blumenfeld breached its duty to communicate with and advise Dr. dePape. The court, therefore, turns next to whether Blumenfeld's breach caused Dr. dePape's alleged damages.

### b. Causation

■■■ The third element that the plaintiff must prove by the greater weight of the evidence in a legal malpractice claim is that "the attorney's breach of duty proximately caused injury to the client." *E.g., Ruden*, 543 N.W.2d at 610. "The burden of proving proximate cause in a legal malpractice action is the same as any other negligence action. To recover, the injured must show that, but for the attorney's negligence, the loss would not have occurred." *Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg*, 428 N.W.2d 288, 290 (Iowa 1988) (citing *Burke v. Roberson*, 417 N.W.2d 209, 211 (Iowa 1987) (citing D. MEISELMAN, ATTORNEY MALPRACTICE: LAW & PROCEDURE § 3:1, at 39–40 (1980)); R. MALLEN & V. LEVIT, LEGAL MALPRACTICE § 102, at 177–78 (2d ed.1981)). As applied to this situation, the plaintiff must demonstrate that, but for Blumenfeld's failure to communicate with and advise Dr. dePape, Dr. dePape would have (1) gained entry to

the United States or (2) would have chosen to pursue other employment options in Canada instead of attempting to immigrate to the United States.

Blumenfeld argues that the plaintiff's seemingly contradictory testimony precludes a finding that Blumenfeld's breach caused his failed entry. The plaintiff was the first witness to testify on the first day of trial. When asked whether he would have performed a community health care needs assessment if he had known that the TN visa required that he had a bona fide intent to come to the United States on a temporary basis to conduct research, he responded that he would not have. This is so because, according to Dr. dePape, he was trained to be a family physician and that is what he contracted to do in Fort Dodge.

After Dr. dePape testified on the first day of trial, Partners A and B testified as to their skewed interpretation of a TN visa's "temporary entry" requirement and the amount of patient care that could lawfully be performed alongside the community health care needs assessment. While they admitted this was an "aggressive approach," they testified that it would be permissible for Dr. dePape to enter the United States on a TN visa, despite his intent of remaining permanently and of primarily providing direct patient care as a family physician, so long as Dr. dePape's job as a family physician included a teaching or research component.

On the last day of trial and after hearing Blumenfeld's view of the community health care needs assessment for the first time, Dr. dePape took the stand again to testify. This time, Dr. dePape testified that, if Blumenfeld's interpretation of what Dr. dePape could do in the course of performing a community health care needs assessment were legal, he would have worked

with Trimark to structure a position to meet immigration requirements.

The court found Dr. dePape's testimony to be credible. However, the court also finds that Blumenfeld's interpretation of what constitutes a legitimate community health care needs assessment and its interpretation of "temporary entry" are contrary to the plain meaning of the statute. Blumenfeld's "aggressive approach" to the TN law is a sham and unlawful under well-recognized immigration principles.

 Dr. dePape testified that he would have performed a community health care needs assessment only after learning that it would not have interfered with his family practice, which would have been unlawful. The court concludes that, if Dr. dePape had been required to perform a legitimate TN job classification, *i.e.*, teach or conduct a research project that only involved patient care insofar as it related to his clinical studies, he would not have come to the United States to work. Instead, he would have began his private practice or explored other employment options in Canada in lieu of doing *locum tenens* while waiting in vain for his immigration to be approved.

Indeed, Partner A's and Partner B's own publications undercut Blumenfeld's interpretation at trial of the level of patient care Dr. dePape would have been permitted to provide. Partner A published an article that explains this limited level of patient care in the parallel context of an H–1B visa.[11] Partner A explained that an H–1B visa-holder may "engage in patient care which [is] incidental to the teaching or research that [is] the main subject matter of [the non-immigrant's] visa status." Partner A, *Present and Future Availability of the H–1B Visa for Medical Trainees, in* AMERICAN IMMIGRATION LAWYERS ASSOCIATION, AILA'S OCCUPATIONAL GUIDEBOOK: IMMIGRATION OPTIONS FOR DOCTORS, 74, 75 (1995). Partner A further noted that this limitation was a "bar to the usage of H–1 status for [foreign medical graduates] wishing to engage in training or clinical medical practice." *Id.*

Similarly, Partner B described the permissible level of patient care for an H–1B non-immigrant who was involved in teaching and research, as opposed to direct patient care:

The point at which patient care ceases to be incidental is unclear. The very essence of medical education involves clinical demonstration to medical students and faculty. the [sic] language of "incidental patient care" was added as the result of Congressional directive, which implicitly recognizes that academic teaching duties by their very nature involves [sic] patient care services for teaching purposes. Prior to the availability of H–1B visas for the practice of clinical medicine, there was a strong incentive to characterize any patient care associated with teaching and research as incidental. However, with the expanded availability of H–1B visas, assuming an alien physician has the re-

---

**11.** One provision of the H–1B visa allows for the entry and employment of foreign physicians who are entering in order to conduct research or to teach. The employer sponsoring such a physician "must establish that the alien physician ... [i]s coming to the United States primarily to teach or conduct research, or both, at or for a public or nonprofit private educational or research institution or agency, and that no patient care will be performed, except that which is incidental to the physician's teaching or research." 8 C.F.R. § 214.2(h)(4)(viii)(B)(1). Similarly, "Foreign medical school graduates seeking temporary entry in the category of 'Physician (teaching or research only)' may not engage in direct patient care. Patient care that is incidental teaching and/or research is permissible. Patient care is incidental when it is casually incurred in conjunction with the physician's teaching or research." UNITED STATES DEPARTMENT OF JUSTICE IMMIGRATION & NATURALIZATION SERVICES, NAFTA HANDBOOK § 1, ch. 16 (1999), *found at* 1999 WL 33438091.

quired credentials and licensure, it would be best to avoid classifying him/her as a teacher/researcher unless the position truly involves little or no patient care.

Partner B, *H–1B Visa Considerations for Physicians, in* AMERICAN IMMIGRATION LAWYERS ASSOCIATION, AILA'S OCCUPATIONAL GUIDEBOOK: IMMIGRATION OPTIONS FOR DOCTORS, 79, 80 (1995).

Furthermore, Blumenfeld testified that Dr. dePape could have entered the United States with the requisite "temporary entry" intent if the community health care needs assessment were a temporary job. Without deciding the lawfulness of this highly implausible argument, the court notes that Blumenfeld never ascertained Dr. dePape's intent, yet affirmatively represented to INS that he had only a temporary intent to remain in the country. This representation runs contrary to Dr. dePape's and Trimark's unrebutted testimony and is one of the reasons why Dr. dePape was blind-sided at the border. The letter of support seeks a one-year visa, but Dr. dePape's employment contract was for five years, and he intended to establish residency in the United States.

Therefore, because of Blumenfeld's implausible interpretation of "temporary entry" and because of its exceedingly broad interpretation of the level of patient care permissible under the TN classification, the court finds that Blumenfeld attempted to perpetrate a fraud on the INS by representing that Dr. dePape sought entry to the United States as a Physician Consultant. The court is not troubled by the change in the plaintiff's testimony because when the plaintiff testified on the first day of trial, Blumenfeld had not explained its sham interpretation of the regulations and

that performance of the community health care needs assessment would not have interfered with Dr. dePape's practice. When Dr. dePape testified after Partner A and Partner B, he concluded that he would have worked with Trimark to structure a position within the meaning of Blumenfeld's interpretation of the TN classification.

This explanation is credible, but the court declines the plaintiff's invitation to award damages on this theory of recovery for the five years of his employment contract with Trimark. While Dr. dePape would have entered the country under Blumenfeld's interpretation of the law, the court finds that entry would have been unlawful, and awarding damages under these circumstances would contravene public policy. *Cf.* IOWA CODE § 554.2302(1) (2001) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract . . . .").

However, this conclusion does not relieve Blumenfeld of liability because the court also finds that, had Dr. dePape been informed of his immigration options at the outset, he would have pursued other employment in Canada. Therefore, he would have been able to start his own practice or to begin work in an established practice as soon as he was licensed in Canada.

### c. *Damages*

Having determined that Dr. dePape established the causation element of his legal malpractice claim against Blumenfeld by the greater weight of the evidence, the court turns next to the damages, if any, suffered by Dr. dePape for which Blumenfeld is responsible.[12]

12. The court notes that, in its post-trial brief, Blumenfeld argued that Dr. dePape failed to mitigate his damages because, after his failed entry attempt on June 8, 2000, he refused to

take the USMLE's in order to become eligible for an H–1B visa or to apply for a consular visa. Because the court finds that Dr. dePape would not have chosen to work in the United

■ ***i. Lost income.*** The unrebutted testimony at trial established that Dr. de-Pape began a private medical practice in Canada on October 15, 2001. Blumenfeld knew as early as the initial conference between Trimark and Blumenfeld in April of 1999 that Dr. dePape had not taken the USMLE's and, therefore, that Dr. de-Pape's only immigration option was to enter on a TN visa. The court previously found that, had Blumenfeld explained the implications of this to him, Dr. dePape would have chosen to remain in Canada and would have started his practice as soon as possible. Based on the exhibits entered into evidence and Dr. dePape's testimony at trial, the court finds that Dr. dePape would have been qualified to open his practice in Canada in July of 1999. Therefore, Blumenfeld is responsible for the economic damages suffered by Dr. de-Pape beginning July 1, 1999 and ending October 15, 2001. In short, the court finds that the damages period in this case is 28.5 months.

Based on Dr. dePape's testimony that he began his practice on October 15, 2001, exhibit 28 represents 6.5 months of his private practice income. Dr. dePape earned a net income of 106,656.43 Canadian dollars in the last 6.5 months of fiscal year 2002. Therefore, Dr. dePape could have earned a net income of 467,647.38 Canadian dollars during the damages period.

Beginning in January of 1999 and continuing until October of 2001, Dr. dePape performed *locum tenens* in Canada. In 1999, his average monthly net income was 5,025.17 Canadian dollars. In 2000, he earned a net income of 97,456.05 Canadian dollars. And finally, during the first ten and one-half months of 2001, Dr. dePape earned a net income of 35,956.42 Canadian

dollars performing *locum tenens*. Thus, during the damages period, Dr. dePape earned a net income of 163,563.49 Canadian dollars.

The difference between the net income Dr. dePape could have earned during the damages period and what he actually earned is 304,083.89 Canadian dollars, and Blumenfeld is liable for this lost income. Based on the average daily nominal exchange rate from July 1, 1999 through October 15, 2001, Blumenfeld is liable to Dr. dePape for 203,736.20 United States dollars in lost income.

■ ***ii. Emotional distress.*** Dr. dePape also seeks damages for emotional distress, which "can be a proper element of damages in a tort action." *Doe v. Cherwitz,* 518 N.W.2d 362, 365 (Iowa 1994). "Under the tort theory of negligence, there is no general duty of care to avoid causing emotional harm to another. However, where the parties assume a relationship that is contractual in nature and deals with services or acts that involve deep emotional responses in the event of a breach, [Iowa courts] recognize a duty of care to protect against emotional distress." *Clark v. Estate of Rice ex rel. Rice,* 653 N.W.2d 166, 171 (Iowa 2002) (citing *Lawrence v. Grinde,* 534 N.W.2d 414, 421 (Iowa 1995); *Oswald v. LeGrand,* 453 N.W.2d 634, 639 (Iowa 1990)) (internal citation omitted).

■ In this case, Dr. dePape shares a special relationship with Blumenfeld that gives rise to a duty to avoid causing Dr. dePape emotional harm. This is not the sort of legal malpractice case in which mental distress damages are not recoverable. *See Lawrence,* 534 N.W.2d at 422. In *Lawrence v. Grinde,* 534 N.W.2d 414,

States had he been advised of immigration options at the outset of Blumenfeld's engagement, Dr. dePape's refusal to take the

USMLE's is irrelevant, and the court will not address that argument.

422 (Iowa 1995), the Iowa Supreme Court held that a legal malpractice plaintiff could not recover mental distress damages in his legal malpractice action because his distress was too remote to be reasonably foreseeable. There, the plaintiff's attorney failed to disclose a recent settlement on a bankruptcy petition, and the United States government subsequently indicted the plaintiff for bankruptcy fraud. *Id.* at 416–17. The plaintiff was acquitted, but his indictment and trial gave rise to considerable media coverage. *Id.* at 417.

In that case, the mental distress damages sought were indistinguishable from the damages sought for the plaintiff's alleged damages to his reputation. *Id.* at 421. But because the damage to the plaintiff's reputation as a result of the indictment was one-step removed from the defendant's negligent act in preparing the bankruptcy petition, the Iowa court held that the plaintiff's claim for mental distress damages failed on causation. *Id.* at 422.

Here, Blumenfeld was retained to assist Dr. dePape with his immigration, but instead of assisting Dr. dePape, Blumenfeld's negligence placed Dr. dePape directly in harm's way. It should be noted that Blumenfeld would not be liable for the mental distress that might have accompanied a failed *legitimate* entry attempt because it would be unfair under those circumstances to hold a lawyer responsible for the independent decision of an independent governmental entity. But in this case, Blumenfeld not only failed to provide Dr. dePape with sufficient information for him to make an informed decision about his immigration, moments before the entry attempt, Blumenfeld (through Mr. Eiss) counseled Dr. dePape to lie to INS officials in order to gain entry to the United States under false pretenses.

Aside from being unethical, this conduct directly led to the INS official's decision to deny Dr. dePape's visa request and formed the basis of the INS official's accusation that Dr. dePape was a liar. The evidence presented at trial established (1) that the INS official refused Dr. dePape's entry because he believed Dr. dePape was going to practice medicine in the United States, (2) that Dr. dePape intended to enter the United States to practice medicine, (3) that Blumenfeld knew that Trimark's intent in employing Dr. dePape was to have him practice family medicine, which would not have been permissible under TN status, and (4) that despite this knowledge, Blumenfeld advised Dr. dePape to proceed to his INS interview, where he felt as if he was treated like a criminal and was accused of lying. Thus, the emotional distress damages resulting from Blumenfeld's negligence in this case are not one-step removed, and Dr. dePape may recover for them.

The court finds that, while short-lived, Dr. dePape suffered severe and intense emotional distress. He was ambushed at the United States border, asked to perpetrate a fraud on the United States government in order to gain entry, and then sent on his way without even the courtesy of a phone call from his lawyers. At the border, INS officials degraded Dr. dePape, and he felt extraordinarily humiliated. Moreover, he had spent the past fifteen months planning to begin his professional career with Trimark and had made the arrangements to do so. Because of Blumenfeld's failure to inform and communicate with Dr. dePape, his life was changed in an instant. He arrived at the Peace Bridge on June 8, 2000 hopeful and with the expectation that his American dream would finally come to fruition. He had spent ten years preparing and training to be a family physician, and, in Trimark, he found his ideal employer. But instead of being the realization of a dream, Dr. dePape endured a nightmarish experience

that began that day on the Peace Bridge. Blumenfeld ambushed Dr. dePape and then left him stranded without a job, without a home, and without a life to go back to in British Columbia.

Fortunately, Dr. dePape is a person of strong character and incredible integrity. While he was setback by the emotional turmoil surrounding the ambush at the border, he was able to move on and begin anew. Accordingly, the court finds that Dr. dePape is entitled to $75,000 USD for emotional distress to compensate him for the severe level of mental anguish directly caused by Blumenfeld's negligence.

### IV. CONCLUSION

THEREFORE, upon consideration of the evidence and the parties' arguments, the court finds (1) that there is no basis in fact or in law to hold Trinity or Trimark liable for Dr. dePape's damages; and (2) that Blumenfeld was extraordinarily negligent in failing to inform and communicate with Dr. dePape concerning his immigration and in counseling him to perpetrate a fraud on the INS in order to gain entry to the United States; and (3) that, as a result of the damages caused by this negligence, Dr. dePape is entitled to recover from defendant Blumenfeld a total of $278,736.20 USD for his lost income and emotional distress, exclusive of prejudgment interest, as provided for by IOWA CODE § 535.3.[13]

### IT IS SO ORDERED.

---

13. The evidence in this case strongly supports an award of punitive damages against Blumenfeld. Dr. dePape was bushwhacked at the border by Blumenfeld's egregious breach of duty and its willful and wanton disregard for Dr. dePape's rights. The plaintiff did not request punitive damages in his prayer for relief, and the court recognizes its authority to award them when supported by the evidence, even in the absence of a specific prayer for punitive damages. *See Boeckmann v. Joseph*, 889 F.2d 1094, 1989 WL 143078, at *2 (9th Cir. Nov. 29, 1989) (table op.) (affirming district court's award of punitive damages in absence of request because plaintiff plead fraud and, therefore, the defendant was on notice because a finding of fraud supports an award of punitive damages); *Scutieri v. Paige*, 808 F.2d 785, 792 (11th Cir.1987) (holding general statement of damages was reasonably construed to include punitive damages such that a specific prayer was unnecessary and failure to instruct the jury on a punitive award would be reversible error); *In re Land-bank Equity Corp. v. Runnells*, 83 B.R. 362, 376 (E.D.Va.1987) ("A failure to specifically plead and demand exemplary damages will not bar an award of such damages under 54(c) where the body of the complaint alleges facts sufficient to support the award.") (citations omitted).

In Iowa, the standard for punitive damages is "Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." IOWA CODE § 668A.1(1)(a). The court has carefully reviewed the plaintiff's initial and amended complaints but finds that Dr. dePape did not plead sufficient facts to put Blumenfeld on notice that punitive damages were at issue. Therefore, despite the overwhelming evidence to support an award of punitive damages in this case, the court will not impose them.