# IN THE SUPREME COURT OF IOWA

No. 23–0568

Submitted April 10, 2024—Filed June 7, 2024

**DONALD LYLE CLARK,**

Appellee,

vs.

**STATE OF IOWA,**

Appellant.

---

Appeal from the Iowa District Court for Johnson County, Lars Anderson, Chief Judge.

The State appeals from a judgment on a jury verdict awarding emotional distress damages in a legal malpractice action against a state public defender. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General; David M. Ranscht (argued), Assistant Attorney General; and Tessa M. Register (until withdrawal), Assistant Solicitor General, for appellant.

G. Bryan Ulmer III (argued) and Mel C. Orchard III of the Spence Law Firm, LLC, Jackson, Wyoming, and Thomas P. Frerichs and Luke D. Guthrie of Frerichs Law Office, P.C., Waterloo, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether proof of negligence is enough to recover emotional distress damages in a legal malpractice action against a criminal defense attorney whose client was convicted and imprisoned. We previously affirmed the client's sexual abuse conviction and prison sentence in his direct appeal. *See State v. Clark* (*Clark I*), 814 N.W.2d 551, 567 (Iowa 2012). His defense counsel, a state public defender, died before the district court determined in postconviction proceedings that he had provided ineffective assistance and ordered a new trial. The State declined to prosecute, and the client filed this civil action for legal malpractice against the State as the lawyer's employer. The district court granted partial summary judgment, applying issue preclusion to hold that the finding of ineffective assistance in the postconviction proceedings established counsel's negligence as a matter of law. We reversed on interlocutory review and remanded for the factfinder to decide liability and damages. *See Clark v. State* (*Clark II*), 955 N.W.2d 459, 471–72 (Iowa 2021). At trial, the jury found the lawyer negligent and awarded the client $12 million in emotional distress damages. We retained the State's appeal from the resulting judgment.

On our review, we clarify *Miranda v. Said*, 836 N.W.2d 8 (Iowa 2013). The district court and the plaintiff misread *Miranda* as holding that a finding of negligence is sufficient to allow emotional distress damages in this criminal malpractice action.[1] To the contrary, we held in *Miranda* that to recover emotional distress damages for legal malpractice, the plaintiff must prove more than negligence. *Id.* at 33. There, it was sufficient to prove that counsel had

---

[1]"A malpractice claim related to representation of a client in a criminal matter is sometimes referred to as a 'criminal malpractice' claim." *Clark II*, 955 N.W.2d at 464 n.3. We will use that descriptive term in this opinion.

pursued an "illegitimate course of conduct that had no chance of success if the independent decision-maker followed the law." *Id.* For the reasons explained below, we conclude that requiring nothing less than proof of illegitimacy sets the bar too high to recover emotional distress damages for criminal malpractice resulting in wrongful imprisonment. We instead clarify the standard for recovery of emotional distress damages to align with the showing required for punitive damages: proof by a preponderance of clear, convincing, and satisfactory evidence that the criminal defense attorney acted with willful and wanton disregard for the client's rights or safety. *See* Iowa Code § 668A.1(1)(*a*) (2017). The district court erred by instructing the jury that negligence was sufficient. We reverse the judgment for emotional distress damages and remand for further proceedings consistent with this opinion.

### I. Background Facts and Proceedings.

Donald L. Clark was hired in 2001 as a guidance counselor at Lemme Elementary School in Iowa City. In 2009, Clark was accused of sexually assaulting a student, C.B., during the 2003–2004 school year. C.B.—who was previously diagnosed with attention deficit disorder—began attending Lemme Elementary in fourth grade. The next year, while in fifth grade, C.B. began seeing Clark because of concerns about C.B.'s academic performance and lack of concentration in class.

Once or twice a week, Clark would retrieve C.B. from class and go to Clark's office to talk and play board games for about half an hour. Clark and C.B. would sit on the floor of Clark's classroom during each visit. Five years later, C.B. recounted at least two occasions that Clark sexually abused him in his office—both taking place during the second semester of C.B.'s fifth-grade year.

C.B.'s parents noticed a change in C.B. during the 2003–2004 academic school year. His mother observed that he became angry, frustrated, and

unwilling to open up during the second semester. His father felt C.B.'s life "spiraled out of control" after fifth grade. C.B. began using drugs and drinking alcohol in seventh grade. He even attempted suicide. C.B. remained unwilling to open up to his parents.

In 2009, C.B.'s father—a deputy sheriff employed at the Johnson County jail—saw Clark serving time for drunk driving. "There was an incident where Clark was involved in sexual acts in the jail, and C.B.'s father raised the question to C.B. whether anything had ever happened between C.B. and Clark years before." *Clark I,* 814 N.W.2d at 555. C.B. told his father that nothing had happened.

C.B.'s parents enrolled him in Midwest Academy in Keokuk, "a highly structured school for troubled youth." *Id.* According to C.B., while attending group therapy there, another student recounted an incident of sexual abuse. This "brought back the memories" for C.B., prompting him to disclose that he had been sexually abused. C.B. emailed his parents, describing the alleged sexual abuse but without identifying Clark as the abuser. C.B.'s parents notified the school and police. A social worker and detective interviewed C.B., who named Clark as the perpetrator.

Clark was questioned by police in a two-hour recorded interview. When the officer first asked Clark if he touched C.B., Clark responded that "he did not touch or rub [C.B.] in any way." *Id.* at 559 (alteration in original). "This was surprising to the officer because he had not brought up any allegation of rubbing at that point." *Id.* Clark did acknowledge that he was repeatedly alone with C.B. and may have touched the child's leg. Clark also volunteered that he believed C.B. was gay and targeted Clark as a gay man. But Clark consistently denied any wrongdoing with C.B. By then, the police knew Clark had pleaded guilty to

indecent exposure for the 2008 incident in jail, had been fired by the school district, and had lost his teaching license.

The State charged Clark with second-degree sexual abuse in violation of Iowa Code sections 709.1(3), 709.3(2), and 702.17 (2009). The court appointed assistant public defender John Robertson to represent Clark. Robertson handled over 500 cases that year, including nearly four dozen felonies. The trial was set for February 8, 2010. Robertson deposed C.B.'s parents and C.B. on January 20 without telling Clark. A redacted version of C.B.'s email to his parents was given to Robertson on February 3—only five days before trial. The next day, Clark requested an unredacted version of the email and a continuance and additional depositions. The State resisted. The district court held a hearing on February 5 and ordered the full email to be provided to Clark but denied a continuance or further depositions.

**A. Clark's Criminal Trial.** On February 8, the criminal trial against Clark commenced. C.B. was age sixteen and still attending Midwest Academy. C.B. testified that Clark abused him. As told by C.B., the first incident occurred when they were sitting on the floor during a counseling session. Clark moved his hand up C.B.'s thigh and "started touching [C.B.'s] genitals outside of [his] pants." C.B. "tried to tell [Clark] to stop," but Clark "[p]ut his hand over [his] mouth." Clark told C.B. not to tell anyone and walked him back to his class after he calmed down. The second incident occurred a few sessions later when Clark "turned off the lights" and "put a stuffed animal over [C.B.'s] face." Clark then put his hands down C.B.'s pants and began rubbing C.B.'s genitals. After C.B. finished crying, Clark walked him back to his class. C.B. testified that he did not go back to Clark's office after this. When asked if there were other occurrences, C.B. said, "I do remember other times, but those were the only times that I

remember in vivid detail." We summarized Robertson's cross-examination of C.B. as follows:

> Clark's defense counsel then began cross-examination by bringing up the e-mail. His theme was that C.B. was highly troubled and not a credible witness. He got C.B. to admit that he had heard things which people had not said. He suggested that when C.B. was sent to the structured school in the spring of 2009, he made up the accusation against Clark as a way to get out of the school. Clark's counsel had C.B. confirm that earlier the same spring, Clark had been a topic of conversation between C.B.'s father and C.B. regarding sexual acts at the Johnson County jail. The implication of defense counsel's questioning was that C.B. had absorbed what he had heard from his father and then leveled a false accusation against Clark.

*Id.* at 558–59.

A principal and a teacher at Clark's elementary school also testified at trial. They described how Clark covered his narrow office window with paper because the window looked out into a heavily trafficked hallway. The principal testified that he told Clark that he could not cover the window. Clark responded that he wanted his students to have privacy and that he did not want his students to be visible to other students walking through the hallway. The pair reached a compromise: Clark would cover the bottom half of the window so that only adults, not children, could see into the office. The teacher testified about talking with Clark about covering his window. The teacher remembered that Clark had his window half-covered for a while.

An Iowa City police officer who investigated the case testified. He recounted his surprise that Clark, during his interview, denied rubbing C.B. before any allegation of rubbing was mentioned. The officer acknowledged that Clark consistently denied any wrongdoing with C.B. The officer introduced photos of the door to Clark's former office and noted that "unless you ha[d] your face

plastered right up against the window, you c[ould not] see" all of Clark's office. The officer described the office as "kind of out of the way." *Id.* at 559.

The defense called one witness: Clark. He denied any wrongdoing. Clark testified that he never touched a child during a counseling session, not even a hug. Clark testified that when he was counseling C.B., the window was always uncovered, and the lights were never off. The defense offered no photos of Clark's office door.

At the end of the three-day trial, the jury found Clark guilty of second-degree sexual abuse. Clark was sentenced to an indeterminate term not to exceed twenty-five years in prison, with a seventeen-and-a-half-year mandatory minimum. *See id.* at 560. Clark appealed, arguing that the district court violated his due process rights by denying his continuance and further depositions after the late disclosure of C.B.'s email. Clark also argued that he received ineffective assistance of counsel. We transferred Clark's appeal to the court of appeals, which affirmed the district court, over a dissent. *Id.* We granted Clark's application for further review and affirmed his conviction. *Id.* at 560, 567. Noting the lack of a constitutional right to depositions in criminal cases, we concluded that the district court did not violate due process by denying Clark a continuance or further depositions. *Id.* at 561–63. We noted that Robertson was able to cross-examine C.B. about the contents of the email. *Id.* at 562. We also determined that the record was inadequate to address Clark's ineffective assistance claims, which could be raised in postconviction proceedings. *Id.* at 567. Two justices dissented and would have reversed for a new trial. *Id.* at 567–72 (Appel, J., dissenting, joined by Hecht, J.).

**B. Clark's Postconviction Relief.** In September 2012, Clark filed an action for postconviction relief (PCR), claiming ineffective assistance of counsel and discovery of new evidence. Clark alleged that his trial attorney, Robertson,

failed to (1) properly investigate and prepare Clark's defense, (2) reasonably communicate with Clark, (3) make an adequate record to support a continuance and additional depositions in response to the late disclosure of C.B.'s email, and (4) file a motion in limine or object at trial to prior-bad-act evidence. Clark's new evidence was C.B.'s deposition testimony in his family's separate civil action seeking money damages from Clark and the school district. C.B. admitted in this deposition "that he lied under oath at the criminal trial; that he also had lied under oath in a prior deposition in the criminal proceedings; and that he knew he was lying under oath when he did so."

While the PCR action was pending, Robertson died unexpectedly—before he could explain his trial strategy or defend his representation of Clark.

In May 2016, the district court, in the PCR action, ruled that Clark was entitled to a new trial in the criminal case "based on Attorney Robertson's alleged failure to properly investigate and prepare for trial and to properly communicate with Mr. Clark, and on the newly discovered evidence."

First, the district court found that Robertson failed to visit, photograph, or designate an investigator to visit Clark's former office at the elementary school. "In a case without physical evidence of abuse by Mr. Clark, the lack of a visit to and independent photography of the area allegedly involved is a product of inattention to the responsibilities of an attorney . . . ." Robertson also received photos from Clark before trial but did not offer them at trial. Robertson did not provide Clark with a copy of the State's photos before trial, and he did not object to the State's photos when offered at trial. The court found that Robertson was ineffective in properly investigating Clark's case.

Second, the court found that Robertson failed to properly communicate with Clark leading up to the trial "about the scheduled discovery depositions, or to obtain and document Mr. Clark's consent to waiver of his presence at the

discovery depositions." The court could not glean any "trial strategy that could be supported by failing to have Mr. Clark attend depositions." The court was further "troubled" by statements Robertson made "that he had obtained waiver of Mr. Clark's presence at the depositions." The facts suggested, instead, that Clark did not waive his presence at the depositions.

Third, the court found that the newly discovered evidence—C.B. testifying to lying under oath at the criminal trial—would have likely changed the result of the trial. The entire case was built on "he said, he said" testimony. With no physical evidence, the court found that this new evidence would have discredited C.B.'s allegations, and the jury may have formed reasonable doubts about C.B.'s story.

The State did not appeal the PCR ruling and dismissed the criminal complaint against Clark. His record was expunged, and Clark was set free after spending over six years in prison.

**C. Clark's Civil Action for Legal Malpractice.** In October 2017, Clark sued the State for legal malpractice, alleging that Robertson's representation of Clark was negligent and "fell below the standard of care expected of licensed attorneys in the State of Iowa."[2]

---

[2]The State is the proper party defendant in Clark's malpractice action. It is undisputed that Robertson was acting within the scope of his employment as a public defender during his representation of Clark. Iowa Code section 669.5(2)(*a*) provides:

> Upon certification by the attorney general that a defendant in a suit was an employee of the state acting within the scope of the employee's office or employment at the time of the incident upon which the claim is based, the suit commenced upon the claim shall be deemed to be an action against the state under the provisions of this chapter, and if the state is not already a defendant, the state shall be substituted as the defendant in place of the employee.

Section 669.5(2)(*a*) supersedes the State's duty to defend and indemnify its employees for tort claims under section 669.21(1) and the exception to that duty for willful and wanton acts or omissions under section 669.21(2)(*a*). *See* Iowa Code § 669.21(2)(*b*) ("The duty to indemnify and hold harmless shall not apply if, in a suit commenced against the employee, the state has been substituted as the defendant in place of the employee, as provided in section 669.5.").

Clark filed a motion for partial summary judgment, arguing that the "breach-of-duty element of his malpractice claim was conclusively established by the PCR ruling under the doctrine of issue preclusion." *Clark II*, 955 N.W.2d at 463. The State resisted, arguing that the ineffective assistance determination by the PCR court was not preclusive against the State. The district court granted Clark's motion and ruled that "the standards for an attorney's conduct are sufficiently similar in both contexts to amount to the same issue under the first prong of issue preclusion." *Id.* The district court rejected "the State's argument that its status as defendant in the malpractice action was different from its status as defendant in the PCR action such that there was a lack of mutuality of parties." *Id.* The State was thereby precluded from arguing breach of duty, leaving the jury to decide only causation and damages.

We granted the State's application for interlocutory appeal and retained the case. We reversed the district court because we determined that "the State as defendant in this malpractice action was not the same party, or in privity with a party, in the PCR action." *Id.* at 471. We held that the State "lacked a full and fair opportunity to litigate whether the criminal defense attorney breached duties owed to Clark in the PCR action." *Id.* We acknowledged that Clark may rely on the same evidence developed in the PCR action to prove that Robertson was negligent in his representation. *Id.* at 471–72.

On remand, the district court granted the State's motion in limine in part and ordered that there should be no reference during the jury trial to Clark's PCR ruling or the State's voluntary dismissal of the criminal charges. The district court concluded: "Neither the district court's postconviction ruling or the State's subsequent dismissal of the criminal case are relevant to the independent decisions that the jury must make on the legal malpractice claim." The district

court denied the State's motion to exclude any reference to nonpecuniary damages—including emotional distress damages.

Trial began September 20, 2022. Clark's first witness was his expert, retired United States District Court Judge Mark W. Bennett. Bennett had presided over 250 criminal trials as a federal judge. After reviewing his extensive experience and qualifications, Bennett was asked about the standard for ineffective assistance claims compared to the standard for negligence in malpractice claims:

> Q. Now help us understand this: Is ineffective assistance of counsel in the Sixth Amendment standpoint, the same standard as negligence, the standard that we have in this particular court?
>
> A. No, but they're first cousins in my view.
>
> Q. Explain that so we understand it.
>
> A. Well, there's an overlap of -- particularly, in this kind of case where Mr. Clark is alleging that his court appointed lawyer John Robertson is negligent. He can't bring that claim, as I understand it, unless there's been a determination by a judge, that Mr. Robertson violated the Sixth Amendment and provided ineffective assistance of counsel.

The State objected to Bennett's answers and moved for a mistrial. The State argued that the "jury now knows that the Court has made a finding" that Robertson was ineffective, contrary to the order in limine. Clark responded that any violation of the order in limine was unintentional and proposed a curative instruction. Clark alternatively argued that the jury should hear about the ineffective assistance finding in the PCR proceeding because "[i]t's part of [Clark's] own story and his own testimony."

The district court, stating that "it's a close call," denied the State's motion for a mistrial. The court instructed the jury to disregard the last answer given by Bennett and offered to give a curative instruction if requested. The State did not

request one. Because of the court's order in limine, the jury never heard that C.B. later admitted to lying under oath at the criminal trial and that postconviction relief was granted in part based on that new evidence.

Bennett's testimony resumed. Bennett specifically stated that Robertson's conduct fell below the appropriate standard of care in his lack of investigation and in preparing for and conducting the trial. He testified that Robertson's deposition of the State's investigator was the "worst deposition [he] had ever seen." He opined that Robertson's failure to show Clark any of the State's evidence before trial was "so far below the standard of care that I just simply can't imagine a lawyer not showing their client the opposing parties' evidence and going over that evidence with the client and trying to learn if there are any ways to rebut it." Bennett also opined that Robertson meeting with Clark for only two to three hours before trial was "grossly inadequate" and "inconceivable." Bennett testified that Robertson was negligent in representing Clark and that his negligence was a cause of Clark's incarceration.

Clark next called an investigator from the State Public Defender's office. The investigator testified that only a week or two after Clark's conviction, Robertson admitted to him that he was "ineffective." The investigator noted that Robertson prided himself on lack of trial preparation and did not assign any tasks to investigate. Two teachers from the elementary school testified, discussing Clark as an outstanding counselor who was a "safe person that people could go to." Clark's therapist testified, recounting the emotional toll of the conviction on Clark and opining that Clark suffers from post-traumatic stress disorder.

Then Clark took the stand. He expressed his frustration with Robertson, who failed to keep him informed. Robertson did not let Clark know in advance about the depositions or provide Clark with transcripts. Robertson failed to

follow up on Clark's list of possible witnesses and spent no more than a total of "two and a half to three hours" with him before trial. Clark recounted his prison experience, how he missed his family, and highlighted his fear of being harmed. The district court summarized Clark's testimony supporting his emotional distress claim as follows:

> At trial, Clark testified to being in constant fear for his safety while in prison because his conviction [for sex abuse of a child] was immediately and widely known among the population, and it made him a target. He experienced serious anxiety and depression during his incarceration, and to avoid ambushes, he would walk with his back against the walls. While separated from his family for over six years, he missed important milestones. Clark's father, who visited him in prison, described worrying over Clark's stress-related weight loss and chances of survival. Clark testified that he continues to struggle with anxiety, depression, and nightmares, impacting his relationships and ability to perform day-to-day tasks, and he feels that society still views him as a child molester.

Clark further testified that he had a nonconsensual sexual relationship with a convicted murderer for his own protection in prison. However, after Clark's release from prison, he returned repeatedly to visit that inmate, and when he was barred from visiting the inmate, Clark sued the Department of Corrections to regain visitation.

The State moved for a directed verdict after Clark's case-in-chief, arguing that Clark is not entitled to emotional distress damages. The district court deferred its ruling on the motion. The State called F. Montgomery Brown as a defense expert. Brown testified that he has represented over two thousand criminal defendants. He explained that defending charges of sex crimes against children is especially challenging, even more so here with C.B. testifying in person. Brown downplayed the significance of the photos of the office door and emphasized that the defense was doomed by Clark's "disastrous" police interview before Robertson was appointed to represent him. Brown testified that

depositions tip off the prosecution to defense strategy and that calling character witnesses would have led to more evidence of Clark's sexual aggressiveness with adults. Brown approved Robertson's trial strategy—discredit C.B. and show his motive to give false testimony against Clark, an obvious target after C.B. was told by his father about Clark's sexual misconduct with another inmate in jail. On cross-examination, Brown admitted that he noted "WTF" several times as he reviewed Robertson's file (signifying "what the fuck" to reflect his dismay), and Brown conceded that Robertson breached his duty of care by failing to investigate the alleged crime scene.

The case was submitted to the jury. Over the State's objection, the court submitted Clark's emotional distress claim along with the marshaling instruction that only required proof of negligence. Clark did not seek any other element of damages. The jury found that Robertson was negligent and that his negligence caused Clark's emotional distress damages. The jury awarded Clark $12 million in emotional distress damages. The State filed motions for judgment notwithstanding the verdict (JNOV) or a new trial. The State argued that emotional distress damages are only compensable if the attorney's conduct was "illegitimate," citing *Miranda*, 836 N.W.2d 8, and *Lawrence v. Grinde*, 534 N.W.2d 414 (Iowa 1995) (en banc). The State alternatively argued that Bennett's testimony violated the order in limine and required a new trial. Clark responded, arguing that no showing of illegitimate conduct is required and that emotional distress damages are available when the relationship between Clark and Robertson "involved a transaction charged with emotions . . . in which negligent conduct by Mr. Robertson was very likely to cause severe emotional distress." Clark also argued that Bennett's testimony was not unfairly prejudicial, as the district court properly instructed the jury to disregard Bennett's answer.

The district court denied the State's posttrial motions. The district court concluded that Clark's incarceration was akin to a physical injury, thus permitting emotional distress damages without a finding of illegitimate conduct. The district court applied *Lawrence* to allow emotional distress damages "where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm." (Quoting *Lawrence*, 534 N.W.2d at 421.)

The district court also found that Bennett's testimony did not violate its order in limine. The court viewed Bennett's discussion of the standard for negligence and the standard for ineffective assistance of counsel as legally correct and therefore not improper. And the court determined that Bennett's testimony regarding a judicial finding of ineffective assistance by Robertson did not require a mistrial because the court promptly told the jury to disregard that testimony.

The State appealed, arguing that emotional distress damages can only be recovered in legal malpractice cases with a finding of illegitimate conduct, and Bennett's testimony that Robertson violated the plaintiff's constitutional rights and provided ineffective assistance of counsel was per se prejudicial. We retained the appeal.

**II. Standard of Review.**

"We review a district court's ruling on a motion for judgment notwithstanding the verdict for errors at law." *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014). "We consider the evidence presented at trial in the light most favorable to the nonmoving party." *Miranda*, 836 N.W.2d at 14. "Every legitimate inference that reasonably may be deduced from the evidence must be afforded the nonmoving party; and if reasonable minds can differ as to how the issue should be resolved, a jury question is engendered." *Id.*

(quoting *Henkel v. R & S Bottling Co.*, 323 N.W.2d 185, 187–88 (Iowa 1982) (en banc)). "Ultimately, we decide whether the district court's determination that there was or was not sufficient evidence to submit the issue to the jury was correct." *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017).

### III. Analysis.

"The general rule in Iowa is emotional distress damages are not recoverable in torts 'absent intentional conduct by a defendant or some physical injury to the plaintiff.'" *Miranda*, 836 N.W.2d at 14 (quoting *Clark v. Est. of Rice ex rel. Rice*, 653 N.W.2d 166, 169 (Iowa 2002)). We have only once allowed a claim for emotional distress damages to proceed in a legal malpractice action. *See id.* at 33; *id.* at 35 (Waterman, J., dissenting) ("Today's opinion marks the first time an Iowa appellate court has allowed a claim for emotional distress to proceed in a legal malpractice action.").[3] The State argues that *Miranda* allows recovery of emotional distress damages only when the lawyer undertook an illegitimate course of conduct that had no chance of success. Clark argues, and the district court agreed, that such a finding is not required when the criminal defense attorney's negligence results in a prison sentence. We agree with the State in part: the plaintiff must prove more than negligence to recover emotional distress damages in this criminal malpractice action. *See id.* at 33 (majority opinion).

In *Miranda*, Ecuadorian citizens sued their immigration lawyer for malpractice after they followed his advice, left the country, and were barred from reentry. *Id.* at 11–12. As a result, they were separated from their children and grandchildren, who lawfully remained living in Iowa. *Id.* at 12. The district court

---

[3] A federal district court applying Iowa law in a bench trial awarded $75,000 in emotional distress damages against an immigration lawyer who unethically advised his client to lie to the Immigration and Naturalization Service in a failed attempt to gain entry into the United States under false pretenses. *See dePape v. Trinity Health Sys. Inc.*, 242 F. Supp. 2d 585, 615–17 (N.D. Iowa 2003).

granted the defendant's motion for directed verdict, dismissing claims for emotional distress and punitive damages. *Id.* at 13. The jury found the attorney negligent and awarded the only damages submitted—$12,500 in attorney fees. *Id.* The court of appeals reversed the directed verdict rulings and reinstated the emotional distress and punitive damage claims, and we granted the defendant's application for further review. *Id.* at 13–14.

We began our analysis with the general rule that emotional distress damages are not recoverable unless the defendant engaged in intentional misconduct or physically injured the plaintiff. *See id.* at 14. But "[w]e recognize[d] 'a duty to exercise ordinary care to avoid causing emotional harm' when supported by the nature of the relationship between the parties and the nature of the acts engaged in by the defendant within the context of the relationship." *Id.* (quoting *Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990)). We noted that we addressed this concept in *Lawrence*, where we held that the client's "claimed emotional distress was 'one step removed' from [his bankruptcy] attorney's negligence." *Id.* at 25 (quoting *Lawrence*, 534 N.W.2d at 422). We distinguished legal malpractice cases involving pecuniary interests from those affecting personal relationships. *Id.* at 32. We noted that it "is generally foreseeable that emotional distress would accompany the prolonged separation of a parent and child." *Id.*

But in reinstating the emotional distress claim, we relied on evidence showing that the lawyer pursued an illegitimate course of conduct highly unlikely to succeed:

> Here, we can draw the line at the nature of this attorney–client relationship and the likelihood that serious emotional harm would result from negligently undertaking *the illegitimate course of action.* While the relationship was formed for the purpose of establishing a path to citizenship and a means to keeping the family united, Said only pursued *an illegitimate course of conduct that had no chance of*

> *success if the independent decision-maker followed the law.* The negligent conduct was doomed to directly result in a separation of the family for a decade. In this light, it was the type of relationship in which negligent conduct was especially likely to cause severe emotional distress, supporting a duty of care to protect against such harm.

*Id.* at 33 (emphasis added). We referenced a concern that "awards of emotional distress damages against attorneys may have a chilling effect on the practice of public interest law." *Id.* But we dispelled that concern by emphasizing that illegitimate conduct must be shown:

> Importantly, it is not just the nature of the relationship that supports emotional distress damages, but the high likelihood of such damages from negligent acts engaged in by the lawyer. *The duty arises when those acts are illegitimate and, if pursued, are especially likely to produce serious emotional harm.* Therefore, the standard is not one that threatens the practice of law, but is consistent with the ideals that protect the integrity of the practice of law.

*Id.* (emphasis added). In reinstating the punitive damage claim, we equated the lawyer's "meritless" strategy to the showing required for punitive damages: a "willful and wanton disregard for the rights or safety of another." *Id.* at 34 (quoting Iowa Code section 668A.1(1)(*a*) (2005)). That is, one way to prove the immigration lawyer acted with a willful and wanton disregard for his client's rights is by proving the lawyer pursued an illegitimate course of action highly likely to result in an otherwise avoidable prolonged family separation.

Clark never proved that Robertson pursued an *illegitimate* defense strategy that was highly likely to fail. Our court of appeals has recognized that *Miranda* requires "more than ordinary negligence and an emotional personal relationship to permit recovery for emotional distress in legal malpractice." *McFarland v. Rieper*, No. 18–0004, 2019 WL 2871208, at *3 (Iowa Ct. App. July 3, 2019). That court, applying *Miranda*, reversed a judgment awarding emotional distress damages arising from a failed adoption because the plaintiffs failed to prove the

attorney "engaged in illegitimate conduct that was especially likely to produce serious emotional harm." *Id.* at *3–4.

Clark and the district court relied on a statement taken out of context from a footnote by the dissent in *Miranda* equating incarceration with the physical injury required for an award of emotional distress in a negligence action. In denying the State's motion for JNOV, the district court reasoned:

> There is no settled case law in Iowa that addresses the availability [of] emotional distress damages in the context of malpractice by a criminal defense lawyer which results in incarceration. However, the dissent in *Miranda* noted the Restatement position that emotional distress damages are "ordinarily recoverable when misconduct causes a client's imprisonment." *Miranda,* 836 N.W.2d at [39] n.15 (Waterman, J., dissenting) (citing Restatement (Third) of the Law Governing Lawyers § 53 cmt. *g*, at 393 (2000)). Though Iowa has not adopted the Restatement view, Justice Waterman tied the Restatement view to existing Iowa law, stating that in his view "incarceration and involuntary civil commitment [were] akin to [a] physical injury (loss of mobility and freedom)." *Id.* Justice Waterman contrasted incarceration to the situation of the Plaintiffs in Miranda who had not lost their freedom. *Id.* Clearly, in this case Clark did lose his freedom and the jury found that loss attributable to misconduct by his trial counsel.

(Third alteration in original.)

But in fact, the *Miranda* dissent expressly disfavored allowing recovery of emotional distress damages in legal malpractice actions without proof of "egregiously bad legal advice . . . [where the attorney] acted so recklessly, willfully, and wantonly that punitive damages may be awarded." 836 N.W.2d at 36 (Waterman, J., dissenting). The dissent cautioned against allowing "emotional distress awards based on an attorney's simple negligence." *Id.* at 36, 41 ("We should continue to disallow emotional distress awards in a legal malpractice action in which the attorney is merely found negligent."). The dissent approvingly cited New York's highest court, the Court of Appeals, which "declined to allow emotional distress claims against lawyers whose mistakes led to a client's longer

imprisonment." *Id.* at 40 (citing *Dombrowski v. Bulson*, 971 N.E.2d 338, 340–41 (N.Y. 2012)). And the dissent approvingly quoted that court's warning that allowing emotional distress damages would harm the criminal justice system by deterring lawyers from representing indigent defendants:

> Allowing this type of recovery would have, at best, negative and, at worst, devastating consequences for the criminal justice system. Most significantly, such a ruling could have a chilling effect on the willingness of the already strapped defense bar to represent indigent accused. Further, it would put attorneys in the position of having an incentive not to participate in post-conviction efforts to overturn wrongful convictions. We therefore hold that plaintiff does not have a viable claim for damages and the complaint should be dismissed in its entirety.

*Id.* (quoting *Dombrowski*, 971 N.E.2d at 340–41).[4]

While we remain persuaded that more than negligence should be required, we believe *Miranda* would set the bar too high in criminal malpractice cases when read as requiring nothing less than proof that the lawyer pursued an illegitimate course of conduct that was nearly certain to fail. No other state requires that proof. *See Gilbert v. Johnson,* No. 4:22–CV–3248, 2024 WL 1090669, at *1–2 (D. Neb. Mar. 12, 2024) (collecting cases, with no other state using an illegitimacy standard). Exercising our common law authority, we clarify *Miranda*'s standard for recovery of emotional distress damages to align with the proof required for punitive damages under Iowa Code section 668A.1(1)(*a*) (2017): proof by a preponderance of clear, convincing, and satisfactory evidence that the criminal defense attorney acted with willful and wanton disregard for

---

[4]That warning applies with even greater force today as Iowa courts confront a critical absence of lawyers willing to serve as court-appointed defense counsel in criminal cases. In the last decade, Iowa has lost almost fifty percent of its contract attorneys willing to undertake court-appointed criminal defense of indigent clients. *See* Haley Bohlmann, *Indigent Defense in Iowa*, The Iowa Lawyer, Mar. 2023, at 8. This crisis would be exacerbated by allowing emotional distress awards against defense attorneys who are merely negligent.

the client's rights or safety. Our holding is supported by persuasive authority in other jurisdictions.

"Most jurisdictions do not allow recovery for emotional distress in legal malpractice absent extreme and outrageous conduct." *Akutagawa v. Laflin, Pick & Heer, P.A.*, 126 P.3d 1138, 1143 (N.M. Ct. App. 2005); *see also Froid v. Zacheis*, 494 P.3d 673, 678 (Colo. App. 2021) ("Like the majority of states, Colorado follows the rule 'that damages for emotional injuries are not recoverable if they are a *consequence* of other damages caused by the attorney's negligence or a fiduciary breach that was not an intentional tort.' " (quoting 3 Ronald E. Mallen, *Legal Malpractice* § 21:19, Westlaw (2021 ed. database updated Jan. 2021))); *Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 562 (Minn. 1996) (en banc) (requiring "willful, wanton or malicious conduct; mere negligence is not sufficient"); *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980) (requiring "extreme and outrageous conduct"); *Vincent v. DeVries*, 72 A.3d 886, 894 (Vt. 2013) ("The vast majority of jurisdictions do not allow recovery of emotional distress damages in legal malpractice cases where the claim of malpractice is not premised on intentional acts, physical injury, or particularly egregious conduct."); *Long-Russell v. Hampe*, 39 P.3d 1015, 1020 (Wyo. 2002) (requiring "willful, wanton or malicious conduct" (quoting *Lickteig*, 556 N.W.2d at 562)).

But what about cases where the lawyer's malpractice results in the client's loss of liberty? Does incarceration equate to a physical injury supporting an emotional distress award against a criminal defense lawyer who was merely negligent? Historically, the law disfavored emotional distress awards in

negligence actions without a physical injury in part because purely mental injury claims are easily faked:

> [I]n the absence of the guarantee of genuineness provided by resulting bodily harm, such emotional disturbance may be too easily feigned, depending, as it must, very largely upon the subjective testimony of the plaintiff; and that to allow recovery for it might open too wide a door for false claimants who have suffered no real harm at all.

2 Restatement (Second) of Torts § 436A cmt. *b*, at 461–62 (Am. L. Inst. 1965). Clark's more than six years in prison dispels any concern that his resulting mental distress was not real. As a California appellate court observed in *Holliday v. Jones*:

> If the purpose in prohibiting the award of emotional distress damages absent physical injury or intentional or affirmative misconduct is to screen out fraudulent or speculative claims, the necessity for such screening is simply nonexistent here when loss of liberty and its consequent impact on Holliday is not only a reasonable and foreseeable consequence of Jones' professional incompetence in defending Holliday in his murder trial, but virtually a guaranteed result.

264 Cal. Rptr. 448, 457 (Ct. App. 1989). The *Holliday* court affirmed a $400,000 emotional distress award based on the criminal defense lawyer's negligence. *Id.* at 449, 458. The *Holliday* court noted that no evidence was presented on whether its decision would affect "the cost and availability of malpractice insurance" for privately retained criminal defense counsel and declined to speculate "[o]n a silent record." *Id.* The court also expressly limited its holding to privately retained counsel and deferred to the legislature to decide "whether public lawyers should be immune from" emotional distress damages. *Id.* New Jersey, for example, provides public defenders with statutory immunity from their client's emotional distress claims, with an exception for "intentional, willful, malicious or other outrageous conduct." *See Nieves v. Off. of the Pub. Def.*, 230 A.3d 227, 236–38,

237 n.5 (N.J. 2020). Illinois likewise provides statutory immunity for public defenders except for willful and wanton misconduct. *See Johnson v. Halloran*, 742 N.E.2d 741, 744 (Ill. 2000).

Importantly, in California, unlike Iowa, criminal malpractice plaintiffs must prove their actual innocence to recover from their criminal defense counsel. *See Wiley v. County of San Diego*, 966 P.2d 983, 985, 991 (Cal. 1998). Indeed, most jurisdictions require proof of actual innocence. *See Barker v. Capotosto*, 875 N.W.2d 157, 166, 168 (Iowa 2016) (collecting cases and adopting minority rule for Iowa).[5] Cases such as *Holliday* are distinguishable because Iowa does

---

[5]An Iowa statute provides an additional avenue for relief for wrongful imprisonment. The "Iowa wrongful imprisonment statute," Iowa Code section 663A.1, allows for a person to sue for damages for wrongful imprisonment, but it requires proof of actual innocence. *State v. McCoy*, 742 N.W.2d 593, 596, 599 (Iowa 2007) (holding that the "person must establish more than the absence of guilt in law to establish innocence under section 66[3]A.1(2)[, t]he person must be factually innocent, not merely procedurally free from reprosecution or not guilty" (citation omitted)); *see* Iowa Code § 663A.1(6)(*b*) (limiting damages recoverable from the state, but including liquidated damages—"an amount equal to fifty dollars per day of wrongful imprisonment"). Clark did not pursue relief under this statute.

Plaintiffs bringing a common law action for a state public defender's criminal malpractice must prove that they obtained relief on direct appeal or in postconviction relief proceedings based on a judicial determination that their conviction resulted from ineffective assistance of counsel. *See* Iowa Code § 13B.9(2). Iowa Code section 13B.9(2) provides:

> An attorney appointed under this section is not liable to a person represented by the attorney for damages as a result of a conviction in a criminal case unless the court determines in a postconviction proceeding or on direct appeal that the person's conviction resulted from ineffective assistance of counsel, and the ineffective assistance of counsel is the proximate cause of the damage.

In *Barker*, we described the same statutory protection for court-appointed counsel in Iowa Code section 815.10(6) as establishing "immunity for appointed counsel unless a postconviction court determines that the client's 'conviction resulted from ineffective assistance of counsel.' " 875 N.W.2d at 167–68 (quoting Iowa Code § 13B.9(2) (2005)). Iowa Code section 13B.9(2) provides the same immunity to public defenders. Clark does not argue that section 13B.9(2) creates a private right of action. *See generally Shumate v. Drake Univ.*, 846 N.W.2d 503, 509 (Iowa 2014) (explaining the four-part test for determining whether a statute provides an implied cause of action and stating that "[o]ur 'central inquiry' is whether the legislature intended to create a private right to sue"). In our view, section 13B.9(2)'s statutory conditional *immunity* cannot be construed as creating a private right to sue for emotional distress damages. We see no indication that the legislature, by enacting a conditional bar to recovery, thereby intended to

not require proof of actual innocence.[6] An actual innocence requirement in itself heightens the bar for recovery of emotional distress damages in a criminal malpractice case.

For policy reasons, some courts disallow mental injury claims altogether, even when the defense counsel's malpractice results in prison time. *See, e.g.,*

---

expose public defenders to new liability for emotional distress damages unavailable at common law.

[6]Clark relies on *Wagenmann v. Adams*, allowing emotional distress damages against a lawyer whose negligent representation led to the client's confinement in a psychiatric hospital in civil mental health commitment proceedings. 829 F.2d 196, 221–22 (1st Cir. 1987) (applying Massachusetts law). *Wagenmann* is distinguishable on two grounds. First, the court concluded that the lawyer "committed malpractice 'so gross or obvious' that expert testimony was not required to prove it." *Id.* at 219. Clark makes no such argument and appropriately relied on expert testimony. Second, Massachusetts, unlike Iowa, requires proof of actual innocence in criminal malpractice cases. *See Glenn v. Aiken*, 569 N.E.2d 783, 787 (Mass. 1991).

Both Clark and the State cite Florida precedent. Florida requires proof of actual innocence in criminal malpractice actions. *See Schreiber v. Rowe*, 814 So. 2d 396, 399 (Fla. 2002) (per curiam). The Florida Supreme Court, in *Rowell v. Holt*, affirmed a $16,500 emotional distress award against the state's Office of the Public Defender for negligent representation where the assistant public defender held "the key to freedom"—indisputably exonerating evidence provided by the client—but delayed filing it, resulting in extra time behind bars for the innocent client. 850 So. 2d 474, 480–81 (Fla. 2003). Clark does not claim Robertson withheld indisputably exonerating evidence. The *Rowell* court limited its holding to the facts, emphasizing that emotional distress damages would not be allowed for "negligence arising from insufficient preparation, incomplete investigation, legal ineptitude, or any other subjective indicia of a lawyer's performance." *Id.* at 481; *see also Reid v. Daley*, 276 So. 3d 878, 880–81 (Fla. Dist. Ct. App. 2019) (declining "to extend the narrow holding in *Rowell* to the circumstances here"). Florida caselaw does not support Clark's argument that negligence is sufficient for his emotional distress award.

Clark also relies on *Lawson v. Nugent*, 702 F. Supp. 91, 92, 95 (D. N.J. 1988) (noting a paucity of New Jersey caselaw and allowing emotional distress claim to proceed based on allegations that "but for [the lawyer's] negligent legal representation," the plaintiff would have avoided "the 'extra' twenty months of confinement in a maximum security penitentiary"). Proof of actual innocence is not required under New Jersey law. *Marrero v. Feintuch*, 11 A.3d 891, 898 (N.J. Super. Ct. App. Div. 2011). But the New Jersey Supreme Court subsequently vacated an emotional distress award arising from the negligence of a state public defender whose client was wrongfully imprisoned for twelve years; the high court enforced a statutory immunity for negligence under its state Tort Claims Act. *See Nieves*, 230 A.3d at 236–38. The plaintiff did not allege "intentional, willful, malicious or other outrageous conduct" that falls within a statutory exception to immunity. *Id.* at 237 n.5. New Jersey caselaw fails to support Clark's argument that he can recover emotional distress damages based on the negligence of his public defender.

*Dombrowski*, 971 N.E.2d at 340–41 (quoted above); *Smith v. McLaughlin*, 769 S.E.2d 7, 12, 20–21 (Va. 2015) (vacating a $5.75 million award to a client imprisoned for over four years and holding emotional distress damages are not recoverable for legal malpractice). Minnesota, for policy reasons, more broadly holds that public defenders are immune from legal malpractice claims. *See Dziubak v. Mott*, 503 N.W.2d 771, 777 (Minn. 1993) (en banc) ("The extension of immunity to public defenders will ensure that the resources available to the public defender will be used for the defense of the accused, rather than diminished through the defense of public defenders against civil suits for malpractice."). Federal and state public defenders in many jurisdictions enjoy some form of judicial or statutory immunity from malpractice claims. *See Laughlin v. Perry*, 604 S.W.3d 621, 629–32 (Mo. 2020) (en banc) (collecting cases and statutes nationwide).

Other courts require proof of reckless, willful, wanton, or intentional misconduct to recover for mental anguish even when the attorney's malpractice results in the client's loss of liberty by arrest or incarceration. *See, e.g.*, *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 306 S.E.2d 340, 341, 343–44 (Ga. Ct. App. 1983) (affirming directed verdict on emotional injury claim against defendant law firm whose advice led to client's arrest for securities fraud "due to the absence of allegations and proof of physical injury or wanton, voluntary or intentional misconduct"); *Bowman v. Doherty*, 686 P.2d 112, 116–17, 119 (Kan. 1984) (reversing partial summary judgment for defense counsel on mental injury claim where lawyer's "wanton" inaction led to client's arrest for failure to appear); *Bailey v. Tucker*, 621 A.2d 108, 114–15 (Pa. 1993) (requiring proof the criminal defense attorney acted with "reckless or wanton disregard of the [client's] interest" and " 'but for' the attorney's conduct, the [client] would have obtained an aquittal or a complete dismissal of the charges").

The Supreme Court of Pennsylvania emphasized "significant" policy reasons for requiring more than proof of negligent misconduct:

> [A]vailability of actions by defendants against their former attorneys will provide a powerful disincentive to practitioners in the field to continue in that field; the proliferation of such suits will certainly increase insurance premiums for such practitioners; and such costs will ultimately be passed on to the system at large, because there will be fewer attorneys to represent a greater number of clients, and the cost of retaining such attorneys will inevitably rise.

*Bailey*, 621 A.2d at 114. We share these concerns.

We hold that in order to recover emotional distress damages for criminal malpractice, the plaintiff must prove by a preponderance of clear, convincing, and satisfactory evidence that the criminal defense attorney acted with willful and wanton disregard for his client's rights or safety. *See* Iowa Code § 668A.1(1)(*a*).

The district court erred by instructing the jury that Robertson's negligence was sufficient to support an award of emotional distress damages and by entering judgment on the resulting verdict. We reverse the court's judgment, and we remand for further proceedings consistent with this opinion.[7]

Based on this disposition, we do not reach the issue of whether the district court abused its discretion by denying the State's motion for mistrial after Bennett's testimony indicated that the district court previously found that Robertson provided Clark with ineffective assistance of counsel. But because the issue may arise on remand, we admonish the parties and the district court that

---

[7]Because the jury was erroneously instructed, and the parties are free to make a different evidentiary record on remand, we express no opinion on whether the evidence in the existing record was sufficient to prove Robertson acted with willful and wanton disregard for Clark's rights. "A supreme court is 'a court of review, not of first view.' " *Ripperger v. Iowa Pub. Info. Bd.*, 967 N.W.2d 540, 552 (Iowa 2021) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)); *see also Bowman*, 686 P.2d at 119 (reversing summary judgment that dismissed emotional distress claim and remanding for trial on whether defense counsel's inaction was "wanton," resulting in client's arrest for failure to appear at hearing).

the jury should *not* be informed of the PCR court's finding. In *Clark II*, we held that the PCR court's finding lacked preclusive effect in this malpractice action. 955 N.W.2d at 471. And in *State v. Huston*, we required a new jury trial on a child endangerment charge because a witness testified that the Iowa Department of Human Services (DHS) determined that the child abuse complaint was founded. 825 N.W.2d 531, 535, 539–40 (Iowa 2013). We concluded that the testimony "was unfairly prejudicial due to the risk the jury would substitute the DHS determination for its own finding of guilt or would give the determination undue weight." *Id.* at 539. Similarly, expert testimony revealing that the district court previously ruled that Robertson provided Clark with ineffective assistance of counsel would unfairly prejudice the State because the jury might substitute the PCR court's ruling for its own finding or give that ruling undue weight.

**IV. Disposition.**

For the foregoing reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**